Plaintiff brought her action against defendants as trustees, alleging that the trustees, without right, had refused to pay her moneys due her and in their possession as trustees, and demanded judgment accordingly. She recovered and the trustees appealed. They moved for a new trial, which was granted, and from the order so doing plaintiff has appealed. These cross-appeals may with advantage be considered together.
Four brothers Huff owned as tenants in common land in the city of Los Angeles and land in the city and county of San Francisco. They were in debt to numbers of persons. While some of these persons were the creditors of all, others were creditors of individual brothers. They entered into a trust agreement, followed by four separate trust deeds, which trust deeds, saving for the list of creditors and the amounts due these creditors, were identical. Each trust deed set forth a schedule list of the creditors of the brother executing it, with declared priority of the liens of these creditors upon one or another, and in certain instances on both, of the real properties above mentioned. The trustees named were to manage the trust properties, and in the event of default to sell the properties, divide the moneys secured from the sales *Page 804 
to the payment of charges arising under the trust, and to the extinguishment of the creditors' obligations, with balance over to the trustors. The trustees were enjoined to sell either the Los Angeles or the San Francisco properties, or both, if necessary, but to sell the Los Angeles property first. Out of the gross proceeds of each sale was to be paid charges and disbursements pertaining to the property sold. The net remainder was to be divided into four portions and "out of the four respective residues the four sets of trustees shall pay off each its set of lien creditors parties to its trust deeds respectively and in the order and rank provided for in said trust deeds respectively." The creditors' indebtednesses were evidenced respectively by promissory notes made to them, and it was further provided that the promissory notes, principal and interest, remaining unpaid at the time of sale should be paid, "but in order as they rank as liens and charges as set forth in said notes and as provided for herein."
The list of creditors with the designated priority of their liens in the Claude Huff trust, known as Trust No. 3, and the Bion Huff trust, known as Trust No. 4, may thus be tabulated:
 CLAUDE HUFF.
 Lien on Lien on
 Notes to To Secure Los Angeles San Francisco
 Property Property
Henry Meyer .............. $ 8,155.00 1st lien 1st lien
Chas. F. Hanlon .......... 11,082.56 2nd lien 2nd lien
Chas. Adler .............. 1,125.00 3rd lien none
Sarah Harrington ......... 1,375.00 4th lien none
Chas. F. Hanlon .......... 15,090.00 5th lien 3rd lien
E.R. Marriott ............ 2,408.08 6th lien 4th lien
A.A. Barber .............. 300.00 7th lien 5th lien
George C. Conde .......... 1,100.00 8th lien 6th lien
 BION HUFF.
Henry Meyer .............. $ 8,155.00 1st lien 1st lien
Chas. F. Hanlon .......... 10,251.87 2nd lien 2nd lien
Charles Adler ............ 1,125.00 3rd lien none
Sarah Harrington ......... 1,375.00 4th lien none
Archibald Reid ........... 1,425.80 5th lien 3rd lien
Chas. F. Hanlon .......... 13,625.95 6th lien 4th lien

Time came when the trustees under their trust were obliged to sell the real estate. In conformity with the mandate of *Page 805 
the trust they first sold the Los Angeles property and devoted the net proceeds of the sale to the extinguishment of the trustors' indebtedness according to the indicated priority. Thereafter they sold the San Francisco property and made like disposition of the proceeds arising therefrom. This the trustees contend they were fully authorized to do under the terms and meaning of the trust agreement and the trust deeds, and herein it is said that the very purpose of the trust mandate that the Los Angeles property should be sold first was that this precise thing should be done; that no one could foresee at the time when the sale took place what would be the extent of the trustors' liabilities, and those liabilities might be wholly extinguished by the sale of one piece of property. Therefore the Los Angeles property was designated as the property first to be sold, and if the proceeds of that sale when applied to the extinguishment of the indebtedness was not sufficient to accomplish this end, a sale of the San Francisco property was to follow. This was the method they adopted, and it is the method of which plaintiff complains. In her complaint she urges and argues that she was entitled in the case of each of these trusts to a marshaling of the assets and to ratable and proportionate distribution among the lien claimants of the joint funds arising from both sales. Thus, to illustrate, assuming that under Trust No. 4 the net proceeds of the Los Angeles property and the net proceeds of the San Francisco property amounted each to fourteen thousand dollars, there would be in the hands of the trustees twenty-eight thousand dollars; from each of these fourteen thousand dollar funds should be taken one-half of $8,155, the amount of the Henry Meyer first lien and one-half of $10,251.87, the amount of the Hanlon second lien; that this method would leave in the Los Angeles fund some four thousand dollars which could and should have been devoted to the extinguishment of the Adler debt amounting to $1,125, and, next, to plaintiff's own debt, amounting to $1,375. The method in fact adopted by the trustees was to pay the Meyer first lien in full out of the sale of the Los Angeles property and the Hanlon second lien in so far as the funds were adequate for that purpose. Thus nothing was left to satisfy the Harrington lien, and funds were left, by the method which the trustees adopted, to serve in part extinguishment at least *Page 806 
of the Reid third lien on the San Francisco property and the Hanlon fourth lien thereon.
Upon trial the court refused to admit in evidence the trust agreement upon the ground that the deeds of trust were complete and spoke for themselves. It found that the method of disbursement adopted by the trustees was arbitrary and in disregard of the just rights of the plaintiff. It found "as a fact and conclusion of law that under the terms of the said trust deeds it was provided that said trustees should pay the liens of Henry Meyer and Charles F. Hanlon out of the joint sums of money derived from the sales of both parcels of real estate and that the proceeds from each parcel should contribute toward the payment of each of said liens of said Meyer and Hanlon, being the first and second liens, in the same proportion as the said two funds bore to each other in amount." The court found that Hanlon was not a necessary party in this marshaling of assets, notwithstanding the fact that by the method which the court proposed to adopt for the disposition of the trust funds, his rights would be injuriously affected. It recognized that it would affect Mr. Hanlon injuriously, but found that it could be done "without impairing any rights of said Hanlon that should not be impaired." The judgment as above indicated followed these findings, necessarily to the detriment of Mr. Hanlon.
It is unnecessary to discuss in detail the matters urged for and against the soundness of the order of the court in granting the new trial, the error in refusing admission to the declaration of trust, in denying to Mr. Hanlon the right to be joined in the action as a party in interest, and other similar considerations. The judgment of the court rests wholly upon its interpretation which it declares to be one of mixed law and fact, that it became the duty of the trustees "under the terms of said trust deed to prorate the proceeds from each parcel of land sold." Clearly, no such duty is imposed upon the trustees by the terms of the trust. The terms of the trust fairly contemplate that the Los Angeles property may be sold alone if its sale will extinguish the trustors' indebtedness, and in terms declares that the proceeds of the sale shall be used to extinguish the lien claims in order of their priorities. It can only be by what the trial court conceived to be the proper application of the equitable doctrine of marshaling of assets *Page 807 
that the court reached the determination which it gave, and which so far from being in accord with the language of the trust deed is, if anything, in violation of it. We may here take for convenient illustration the tabulated list of the Bion Huff lien claimants as above set forth. The lands to which these liens respectively attach are specifically declared, their priorities enumerated with particularity. The right to marshal is a mere equity which may never be invoked when its operation will accomplish inequity. In its simplest form it is, as set forth by Judge Story (Equity Jurisprudence, sec. 633) as follows: "If A has a mortgage upon two different, estates for the same debt, and B has a mortgage upon one only of the estates for another debt, B has a right to throw A in the first instance, for satisfaction upon the security, which he, B, cannot touch, at least where it will not prejudice A's rights, or improperly control his remedies." (See, also, Pomeroy's Equity Jurisprudence, sec. 867; Mack v. Shafer, 135 Cal. 114, [67 P. 40].) But a lien claimant may invoke this equitable principle of marshaling assets only when it will benefit him without injuring others, and if this cannot be done then equity will but follow the law. This familiar principle has been codified in sections 2899 and 3433 of the Civil Code. Moreover, it is equally fundamental that equity will apply the doctrine only to conditions existing at the time when it is invoked. "It can only become a fixed right by taking proper steps to have it enforced, and until this is done it is subject to displacement and defeat by subsequently acquired liens upon the fund. This inchoate right or equity is not a lien, and is therefore subject to defeat at any time before it is attempted to be enforced." (Richards v. Cowles, 105 Iowa, 734, [75 N.W. 648].) In this case no demand was made upon the trustees. Equity's aid was not invoked until long after the sales and disbursements of the moneys by the trustees under the sales. But of more consequence still, an inspection of the table above given will disclose that the method of distribution insisted upon by Mrs. Harrington, though to her advantage, could not be adopted without corresponding injury to the third lien claim on the San Francisco property held by Archibald Reid for $1,245.80 and to the fourth lien claim of Charles F. Hanlon upon the same property for $13,625.95. Therefore, as equity could *Page 808 
not intervene for the advantage of one lien claimant without working proportionate injury to another, it must and will leave them where they have placed themselves under the law.
What is thus said of Trust 4 has, of course, identical application to Trust 3, and for the reasons given the judgment appealed from is reversed and the order granting a new trial is affirmed.
Melvin, J., and Lorigan, J., concurred. *Page 809 
 In Memoriam. Ralph Chandler Harrison, ASSOCIATE JUSTICE OF THE SUPREME COURT OF THE STATE OF CALIFORNIA, 1890-1903. PRESIDING JUSTICE OF THE DISTRICT COURT OF APPEAL OF THE STATE OF CALIFORNIA, IN AND FOR THE FIRST APPELLATE DISTRICT, 1905, 1906.
At the meeting of the Supreme Court of the state of California, held in San Francisco, on Tuesday, September 3, 1918, Dr. Edward Robeson Taylor, on behalf of the memorial committee of the San Francisco Bar Association, presented and read the following memorial of the life and services of Ralph Chandler Harrison, former Associate Justice of that court, and moved that the same be spread upon the minutes of the court. The memorial had been prepared by a committee of members of the Bar of the state of California, consisting of Edward Robeson Taylor, Dean of Hastings College of Law, F.M. Angellotti, Chief Justice of the Supreme Court of California, and Frank P. Deering, a member of the San Francisco Bar. *Page 810 
[EDITORS' NOTE: THIS PAGE IS BLANK.] *Page 811 
 Memorial OF THE LIFE AND SERVICES OF THE Honorable Ralph Chandler Harrison, FORMER ASSOCIATE JUSTICE OF THE SUPREME COURT OF THE STATE OF CALIFORNIA, ALSO FORMER PRESIDING JUSTICE OF THE DISTRICT COURT OF APPEAL OF THE STATE OF CALIFORNIA, IN AND FOR THE FIRST APPELLATE DISTRICT.
Ralph Chandler Harrison. "Know ye not that there is a prince and a great man fallen this day in Israel?" So said King David to his servants, and so might one in authority have said on the eighteenth day of July of the current year of Judge Harrison; for he was a commanding man in every position to which he was called. In intellectuality his eyes fell not before the level of any whom he confronted, while in all the essentials that go to make up a man in rounded completeness, there was nothing to abate. Of such a man a brief account at least deserves to be spread upon the record of the court he honored. The bare facts of his life are authentically recited in a very admirable article on him published in the issue of "The Recorder" of July 20th last, and from that article we extract as follows:" Ralph Chandler Harrison was born at Cornwall Bridge, Connecticut, on the twenty-second day of October, 1833. He was educated at Wesleyan University, taking his bachelor's degree from that institution in 1853. In the same year he became a teacher of mathematics in Armenia Seminary, New York, and in 1854-56 he taught ancient languages and rhetorics in the same institution. He took his master's degree at Wesleyan in 1856. In 1857 he was a member of the Connecticut legislature and then entered Albany Law School, graduating from that institution in 1859 *Page 812 
with the degree of LL.B., and the same year was admitted to practice in the Supreme Court of New York. It was during his attendance at Albany Law School that Judge Harrison met General David D. Colton, who had been sheriff of Siskiyou County, California, and who was a classmate at the law school. Colton suggested to his friend that they return to California and establish themselves in the practice of the law at Yreka, so they journeyed westward, arriving in San Francisco in 1859. Here they remained, establishing law offices under the name of Colton and Harrison, and there began the career at the bar that has made Judge Harrison one of the best known lawyers in the state. After General Colton retired from the practice of the law, Judge Harrison practiced alone for several years, but in 1867 he associated himself with John R. Jarboe, an association that continued until his election to the Supreme Court in 1890. During the last five years of his partnership with Mr. Jarboe, the late William S. Goodfellow was a member of the firm, which was thereafter known as Jarboe, Harrison, and Goodfellow. Their practice was large and important and they appeared as counsel in much of the important litigation of the time. In 1880 Judge Harrison was a member of the Board of Freeholders to frame a charter for the city and county of San Francisco, and in 1886 he served as president of another similar board. In 1890 he was elected as a Republican to the, Supreme Court for the twelve-year term which expired in 1903. In 1904 Judge Harrison was appointed a member of the Supreme Court Commission and in 1905, upon the creation of the District Courts of Appeal, he was appointed Presiding Justice of the Court of Appeal for the First District, organizing that court. Since the expiration of his term in 1906, Judge Harrison had been associated in the practice of his profession with his son, Richard C. Harrison. In 1884, he became a trustee of the San Francisco Law Library. In 1886 he was appointed a life director of Hastings College of the Law, and in 1887 was appointed a trustee of the San Francisco Public Library, a position that he held at the time of his death. He had been since 1874 an honorary member of the California Academy of Sciences, and had been a vice-president of the Geographical Society of the Pacific since 1892."
Judge Harrison was one of the trustees of the San Francisco Public Library for thirty-one years, during the whole *Page 813 
of which time he was a member of its book committee and for many years its chairman. No place could have been better fitted to his knowledge and talents, and those he gave unstintedly to the duties of his office. He had himself a library of the choicest kind to which he was greatly attached; and when the great fire destroyed it and his house as well, he looked upon their destruction like a Roman of old, with no lamentation that betrayed the slightest weakness.
At the time of his death he was the senior member of the noted Bohemian Club of this city, and of this relation Mr. Frank P. Deering, an ex-president of the club and a member of this Memorial Committee, writes as follows: "Judge Harrison at the time of his death was the senior member of the Bohemian Club. He was elected May 7, 1872, and always took a very great interest in all club activities. Such was the interest which he displayed that he was made an honorary life member and was such at the time of his death. He enjoyed to an unusual degree universal respect and affection of the members of the club and four years ago, at the Christmas high jinks, during the presidency of Charles K. Field, Judge Harrison, who had been a member of the club for a greater number of years than any other man then living, welcomed the most newly elected member in a graceful ceremonial, which illustrated the pleasant relations existing in Bohemia between the old and young members, and furnished an opportunity to show toward Judge Harrison the esteem in which he was held. Dignity, courtesy, and geniality characterized Judge Harrison in all walks of life, and these qualities were especially noticeable in his intercourse with those whom he met in Bohemia and were the basis of regard entertained for him."
As a judge, Harrison was thoroughly well qualified, innately and learnedly. His sense of justice was acute, and his education wide and deep. In addition, his reading was various, histories and the like having the preference. His mind once decisively made up, he was firm as a rock. His written opinions have a quality which is invaluable, that of crystalline clearness. There was no thinness, no sloppiness, no ambiguity or obscurities. He never shirked an issue, but fronted it squarely. As a general thing he stated the facts of the case himself, not, leaving that to the reporter. Some of his opinions are landmarks and all *Page 814 
are masterly. His dignity of deportment as a judge was unbending, and never under any circumstances trivial. He looked upon the law with a scientific eye, and had no sympathy with the popular demand, sometimes exhibiting itself offensively, to go outside of the law for means and instrumentalities, but held it a sacred duty to use only the means which the law had provided as the instrumentalities whereby justice was to be achieved. He hewed close to the line, and deemed the legislature and not the courts the one to change the rule. He was courageous, and we do not believe he would have deviated from what he had determined as judicially right under any kind of menace. Still, he was not a lawyer and nothing else; to be such is really to be a dry-as-dust of a man. He kept himself abreast of his times and was, hence, a most valuable citizen, as is demonstrated by his many activities.
Judge Harrison had the singular distinction of being a charter member of the Bar Association of San Francisco. From the time of its birth up to the time of his own death he took a lively interest in all of its affairs, having filled many of its offices. He was a lawyer from the crown of his head to the soles of his feet, and every instrumentality which tended to the betterment of his profession (and the Bar Association he deemed to be such a one) he warmly favored and always advocated. As a lawyer he was thorough and exact. He never left his case until he had exhausted it, nor until he could make to the court the clearest explication of it. In fact, his exceeding painstakingness was one of the most distinguishing marks of his character. With such endowments and such a character it is no wonder that he acquired the confidence of men, and became the possessor of a large practice. In fact, the firm with which he was associated, that of Jarboe and Harrison, was one of the best known in the state.
Judge Harrison was twice married, in 1865 to Miss Juliet L. Waite, who died in 1890, by whom he had three sons, two of whom survive, Richard C. Harrison, his partner at the time of his death, and Robert W. Harrison, at present a deputy attorney-general. His second marriage was to Miss Ella Spencer Reid, who survives him. Judge Harrison grew up with a bar which was exceptionally high, and to which he contributed much of its excellence. He was a man that anyone on seeing would take as distinguished, as indeed he was. His *Page 815 
character was of the highest and his honesty unquestionable. This was demonstrated by the fact that he was treasurer for many years, both of the Bar Association and of the San Francisco Law Library. The latter office he resigned but a short time before his death, having filled it for thirty years. He was exceedingly companionable and with such a fine sense of humor that no really good thing was ever lost on him. Besides, his knowledge was so great that he was a welcome guest at any table. Yet he never aired his knowledge and never made a show of it. He was as free of conceitedness as a man could well be, and in every situation was modest. Your committee would steer clear, as all of us should, of the rocks of the superlative, and yet it is difficult to do so in dealing with such a character as that of Judge Harrison; he seemed to be in every sphere of life what every man should be. He looked at things with a clear eye, and was always courageous, steadfast, and calm. Like Horatio, as Hamlet charactered him, he was
"A man that fortune's buffets and rewards Hast ta'en with equal thanks."
He went on to his next duty, no matter what had happened, without complaining or lament. As he was a brilliant one among the brilliants of the past, so he remained until death laid its fatal finger upon him. In him he had a noble victim; and we who were honored by his friendship should not be bowed down by his death, but rather rejoice in having possessed his inestimable life.
At the conclusion of the presentation of the foregoing memorial, Chief Justice Angellotti expressed the gratitude of the court to Dr. Taylor and Mr. Deering for their action in preparing the memorial, and the concurrence of the individual members of the court in the expressions therein contained, and ordered that the memorial be received and spread upon the minutes of the court and published in the next volume of the California Reports.
 *Page 1