529 F.2d 310
 In the Matter of George Francis FORESTER, doing business as
Forester's Flying Realty, Bankrupt.
A. E. MILLER, Trustee-Appellant,
v.
Bide STEWARD et al., Creditors-Appellees.
 No. 74--2132.
 United States Court of Appeals,
Ninth Circuit.
 Jan. 12, 1976.
 
 Harold A. Block (argued) of Dinkelspiel & Dinkelspiel, San Francisco, Cal., for trustee-appellant.
 Dennis K. Cowan (argued), Redding, Cal., for creditors-appellees.OPINION
 Before HUFSTEDLER and TRASK, Circuit Judges, and HILL,* District Judge.
 TRASK, Circuit Judge:
 
 
 1
 The trustee in bankruptcy appeals from the district court's order granting the Stewards' petition for reclamation, which sought rights to $7,000 in proceeds from certain collateral security.
 
 
 2
 In July 1968, Bide Steward, Winnie Steward, Fern S. Wescott, Gilbert Faulstich and Winola Faulstich (Stewards) sold George Forester land in California and Nevada called the Z--Bar Ranch. Forester borrowed $140,000 from the Federal Land Bank of Berkeley to finance the purchase, giving the bank in return a first deed of trust on the ranch property. Forester gave the Stewards the $140,000 and two notes totaling $125,000 in payment for the land. These notes were secured by a second deed of trust on the ranch in favor of the Stewards.
 
 
 3
 At the same time and as part of the borrowing transaction, Forester gave additional security to the bank to secure his obligation to it. As was required by 12 U.S.C. §§ 721, 733 (since repealed but in force on the date of this transaction), Forester upon his own credit caused $7,000 in Federal Land Bank stock to be pledged to the bank to secure the loan.[1]
 
 
 4
 In early 1970 he deeded his ranch to Great Western Ranches, Inc. (Great Western) as part of a tax free reorganization but retained his interest in the stock of the Federal Land Bank Association of Alturas, since no arrangement was made to convey it to Great Western. On April 16, 1970, the bank threatened foreclosure because no payments had been made on its loan to Forester.[2] On July 1, 1970, Great Western filed a Chapter X petition in bankruptcy. The reorganization court subsequently restrained all creditors from foreclosing on any properties owned by Great Western. On June 25, 1971, Forester was adjudicated a bankrupt.
 
 
 5
 On July 6, 1971, the Stewards obtained a modification of the reorganization court's order protecting Great Western's property. Under the modified order the Stewards were permitted to sell the property under their power of sale in their second deed of trust and to bid it in. They were required by the court, however, to sell the property thereafter and to pay one-half the net proceeds, but in any event not less than $5,000, to the reorganization court trustee. On January 20, 1972, the Stewards completed the bidding-in process, but the debt owed them by Forester was not satisfied.
 
 
 6
 In late 1971 the bank was given authority by the reorganization court to foreclose its first deed of trust, pursuant to notices of default thereunder filed on May 18, 1970. The foreclosure sale could not be held until April 30, 1972.
 
 
 7
 The Stewards, meanwhile, having acquired the property subject to the bank's first deed of trust, proceeded to finalize arrangements to sell the property. They duly made demands upon the bank that it apply the $7,000 in stock to reduce Forester's obligation under the first deed of trust in order to ensure a greater return to the Stewards on the Forester-Steward debt under the second deed of trust. Acting upon the request of the trustee of Forester's estate, the bank declined to do so and also declined to pay the proceeds of the stock to the Stewards upon retirement of the stock after the Stewards paid off the Forester bank debt.
 
 
 8
 In order to prevent their private sale from failing the Stewards did not wait for a resolution of their dispute with the trustee and the bank over the $7,000 stock collateral. Stewards finally agreed to pay the gross amount of the debt to the bank undiminished by the application of the $7,000 credit. Stewards thus completed their sale in April 1972, protesting that the bank should have reduced the Forester balance by $7,000 or should have paid that amount to Stewards if Stewards were required to discharge the bank obligation without such reduction. The Stewards also paid $5,000 to the reorganization court trustee, the minimum they could pay under the court's order, since there were no net proceeds on the transaction. They retained the rest in cash or notes from the buyers to reduce their loss on the overall affair.
 
 
 9
 The bank retired the bank stock in its possession and returned $7,000 to the association. The association then paid the $7,000 to Forester's trustee and retired the $7,000 in association stock it retained.
 
 
 10
 The Stewards filed an application to reclaim the $7,000 in bank stock proceeds with the bankruptcy court. The referee in bankruptcy found for the trustee, holding that the Stewards were volunteers when they paid off the bank loan and had no subrogation rights and that the bankrupt's estate was not unjustly enriched by an award of the proceeds.
 
 
 11
 Upon review, the district court reversed and ordered the trustee to turn the $7,000 over to the Stewards. The court found that the Stewards were subrogated to the bank's rights to apply the collateral security to reduce the amount they had to pay to pay off the Forester bank loan.[3] The court further found that a constructive trust should be implied so that the bankrupt estate was not unjustly enriched at the expense of the Stewards.
 
 
 12
 We affirm the district court's judgment. The Stewards were entitled to subrogation to the bank's security position and to marshaling of the bank's collateral security interest in the stock.
 
 I. Subrogation
 
 13
 Section 2904 of the California Civil Code provides:
 
 
 14
 'Rights of Inferior Lienor. One who has a lien inferior to another, upon the same property, has a right:
 
 
 15
 '1. To redeem the property in the same manner as its owner might, from the superior lien; and,
 
 
 16
 '2. To be subrogated to all the benefits of the superior lien, when necessary for the protection of his interest, upon satisfying the claim secured thereby.'
 
 
 17
 The series of steps that the Stewards took with respect to the ranch were, in effect, a redemption by a junior lienor of a superior lien. In April 1970, prior to any action by the Stewards in this case, the bank threatened to foreclose its first deed of trust. A few months later the Great Western reorganization court restrained the bank, the Stewards, and all other creditors from foreclosing on any Great Western property. The Stewards eventually received approval to foreclose on their second deed of trust on the condition that they then sell the property at the highest price possible and pay one-half the net proceeds to the Great Western trustee, but in any event no less than $5,000. The bank also received permission to foreclose on its first deed of trust after April 29, 1972. The Stewards bid on and acquired ownership of the ranch in January 1972. The sale to third parties was completed in April of the same year; as part of the sale transaction the Stewards paid off the bank loan to Forester.
 
 
 18
 All of these steps by the Stewards were taken to protect their second trust deed interest and to effect their private sale. The ownership of the ranch by foreclosure of the second lien was but a contemporaneous step toward the payment of the bank loan and sale of the property.
 
 
 19
 At the time that Stewards were attempting to clear the title to the land so that a sale could be effected by them, the bank was the holder of the first deed of trust and the security interest in the stock. It had declared the debt which was secured by the lien, in default, and announced that it would foreclose. The reorganization court had given to the bank its authority to foreclose the first deed of trust although directing that the actual sale be deferred. This meant that Stewards in order to effect their private sale had to pay the bank's debt, refinance it or otherwise dispose of it in order to be able to sell the property and provide title free and clear of the first deed of trust. They first attempted to get the bank to apply the stock interest to the debt to reduce the amount of cash Stewards would have to supply. The bank was adamant in its refusal. Stewards then paid to the bank the entire debt principal and interest.[4] When they did so they became legally entitled to be subrogated to the bank's position. They could continue the foreclosure proceedings against Forester or dismiss them and release the first deed of trust. In any event, it was the Stewards and not the bank who had the right to determine whether to apply the stock to the debt. The Stewards were then the creditor in the bank's position with all the bank's lien rights and all of the bank's security rights including the right to apply the $7,000 stock collateral. The bank at that time had no right to release and turn over its security interest in the land and hold back its security interest in the shares of stock (which were part of the same security transaction) and deliver it to the debtor's trustee. When the bank was paid it lost its control over either the lien of the first deed of trust or the security right to the stock or its proceeds.
 
 
 20
 Sections 2903, defining subrogation rights generally,[5] and 2904 of the California Civil Code would apply to give the Stewards subrogation rights to the collateral security in the stock since they paid off the senior lien to protect their junior lien interest. The fact that the Stewards acquired a temporary ownership interest for the purpose of effecting the sale does not deprive them of the protection of sections 2903 and 2904.
 
 
 21
 This approach is supported by general equitable notions. It appears that subrogation is a doctrine broader in its reach than that prescribed in the Civil Code. As the court in Employers Mutual Liability Ins. Co. v. Pacific Ind. Co., 167 Cal.App.2d 369, 334 P.2d 658, 662 (1959), states:
 
 
 22
 'Subrogation is an equitable doctrine, recognized also at law and not depending upon contractual relationships, which is administered so as to secure justice without regard to form. It applies in all cases in which one party, not a volunteer, pays a debt for which another is primarily liable, which in equity and good conscience should have been paid by the latter party.' (Citation omitted).
 
 
 23
 The court went on to enumerate five prerequisites of subrogation:
 
 
 24
 "(1) Payment must have been made by the subrogee to protect his own interest. (2) The subrogee must not have acted as a volunteer. (3) The debt paid must be one for which the subrogee was not primarily liable. (4) The entire debt must have been paid. (5) Subrogation must not work any injustice to the rights of others." 334 P.2d at 662, quoting Grant v. De Otte, 122 Cal.App.2d 724, 728, 265 P.2d 952, 955 (1954).
 
 
 25
 Requirements (3) and (4) are clearly met. Because the Stewards were acting under the direction of the reorganization court's order and with the aim of protecting their own interests they cannot be considered volunteers within the meaning of requirement (2). Fleming v. Kagan, 189 Cal.App.2d 791, 11 Cal.Rptr. 737, 742 (1961); In re Kemmerrer, 114 Cal.App.2d 810, 251 P.2d 345 (1952); Stein v. Simpson, 37 Cal.2d 79, 230 P.2d 816 (1951); Fritz v. Mills, 170 Cal. 449, 150 P. 375, 376--77 (1915). Restatement of Restitution, § 162, Comment b at 654--55, Comment e at 657.
 
 
 26
 Requirement (5) is also met. There would be no injustice to others since Forester did not have a justifiable expectation that his collateral security would return to him after he defaulted on his loans; the trustee and through him the general creditors merely stand in Forester's shoes.
 
 
 27
 Finally, the Stewards also meet requirement (1). They acted in the reasonable belief that they were protecting their own interests. They acted to forestall the bank from foreclosing under its first deed of trust; a judicial sale may not have brought the price the land commanded in the privately arranged sale. The California courts liberally construe the 'interest' requirement even to the extent of subrogating a person who discharges a lien on property he mistakenly believed to be his own. Employers Mutual Liability Ins. Co. v. Pacific Ind. Co., 167 Cal.App.2d 369, 334 P.2d at 663. Therefore, under the liberal rules of equity the Stewards should be permitted to be subrogated to the bank's right to take the collateral security.
 
 II. Marshaling
 
 28
 Marshaling of liens is governed by California Civil Code sections 2899 and 3433:
 
 
 29
 ' § 2899. Marshaling liens
 
 
 30
 'Order of Resort to Different Funds. Where one has a lien upon several things, and other persons have subordinate liens upon, or interests in, some but not all of the same things, the person having the prior lien, if he can do so without risk of loss to himself, or of injustice to other persons, must resort to the property in the following order, on the demand of any party interested:
 
 
 31
 '1. To the things upon which he has an exclusive lien;
 
 
 32
 '2. To the things which are subject to the fewest subordinate liens;
 
 
 33
 '3. In like manner inversely to the number of subordinate liens upon the same thing; and,
 
 
 34
 '4. When several things are within one of the foregoing classes, and subject to the same number of liens, resort must be had--
 
 
 35
 '(1) To the things which have not been transferred since the prior lien was created;
 
 
 36
 '(2) To the things which have been so transferred without a valuable consideration; and,'(3) To the things which have been so transferred for a valuable consideration in the inverse order of the transfer.'
 
 
 37
 ' § 3433. Marshaling assets
 
 
 38
 'Relative Rights of Different Creditors. Where a creditor is entitled to resort to each of several funds for the satisfaction of his claim, and another person has an interest in, or is entitled as a creditor to resort to some, but not all of them, the later may require the former to seek satisfaction from those funds to which the latter has no such claim, so far as it can be done without impairing the right of the former to complete satisfaction, and without doing injustice to third persons.'
 
 
 39
 When the Stewards received their deeds of trust they had a 'subordinate lien' under section 2899 and could require the bank to marshal its liens by proceeding first against the stock (upon which it had an 'exclusive lien') before proceeding against the land. As owners they had an 'interest in' the ranch under sections 2899 and 3433. The fact that Forester no longer had an interest in the land (other than as an asset covering his debt to the bank) does not, as appellant urges, render marshaling inapplicable. Mack v. Shafer, 135 Cal. 113, 67 P. 40 (1901).
 
 
 40
 Prior to the completion of the sale from the Stewards to third parties, the Stewards demanded that the land bank marshal its liens and proceed against the stock. At this point the Stewards' right to marshaling became vested. See Harrington v. Taylor, 176 Cal. 802, 169 P. 690 (1917). The subsequent payment in full of the first deed of trust debt under protest and sale to the third parties cannot be considered a voluntary relinquishment of marshaling rights. Therefore, the doctrine of marshaling would still apply and the stewards would be entitled to the proceeds of the stock.
 
 
 41
 The trustee argues that the California Antideficiency Act, Civil Procedure Code § 580b (West 1955), as amended, prevents recovery by the Stewards. Section 580b provides in pertinent part:
 
 
 42
 'No deficiency judgment shall lie in any event after any sale of real property for failure of the purchaser to complete his contract of sale, or under a deed of trust, or mortgage, given to secure payment of the balance of the purchase price of real property.'
 
 
 43
 This section prevents a foreclosing mortgagee from proceeding personally against the mortgagor to recover a deficiency after the security is exhausted. But the exercise of the power of sale under the deed of trust does not discharge the obligation. Neither does it affect the outstanding first deed of trust which had been declared in default and was ready for foreclosure. A mortgagee may pursue additional security given by the mortgagor if the primary security is insufficient to satisfy the obligation. Freedland v. Greco, 45 Cal.2d 462, 289 P.2d 463 (1955). The use by one lienholder of additional rights possessed by another lienholder is permitted if the junior lienholder pays off the debt owed the senior lienholder. Cal.Civil Code § 2904. Forester's rights under Civil Procedure Code section 580b were not violated. No deficiency judgment was sought or obtained.
 
 
 44
 Appellants urge that under section 70 of the Bankruptcy Act, 11 U.S.C. § 110, they have become entitled to the collateral security because the debt has been paid. It is true of course that the trustee of the estate of a bankrupt becomes vested by operation of law with the title of the bankrupt as of the date of the filing of the petition. It is also true that the Act does not vest the trustee with any better right or title to the bankrupt's property than belonged to the bankrupt at the moment of bankruptcy (subject to exceptions not applicable here). 4A Collier on Bankruptcy 55 (14 ed. 1975). The collateral security in question at the date of bankruptcy had been pledged to the bank to secure repayment of a loan by the bank to the bankrupt made several years before. No question is raised as to the validity of the loan and the pledge to secure it. Had Forester paid the debt he would have been entitled to a release of the collateral given to secure its payment. But he did not repay it. The Stewards paid this debt to protect their interests in the property and they, not Forester, become entitled to the collateral. To give it to Forester (or his trustee) would unjustly enrich him by releasing to him the security for a debt incurred by him which he did not pay.
 
 
 45
 The judgment of the district court is affirmed.
 
 HUFSTEDLER, Circuit Judge (dissenting):
 
 46
 The Stewards had the burden of proving their ownership of the proceeds of the bank stock in their reclamation proceedings. (4A Collier on Bankruptcy P70.39, at 476.2--477 (14th ed. 1975).) They did not and could not carry their burden because they never had a legal interest in the stock or its proceeds and their equitable claims to the stock or its proceeds were at all times inferior to that of Forester's trustee in bankruptcy.
 
 
 47
 To set the equitable stage, I state the essential relevant facts.[1] Forester's trustee succeeded to all of Forester's nonexempt assets on the date that he filed his bankruptcy petition in June 1971. (Bankruptcy Act § 70a, 11 U.S.C. 110; 4A Collier, supra, P70.05, at 65--66.) On that date, Forester owned his redemption right in the pledged bank stock. He owned no interest in the ranch, which he had earlier conveyed to Great Western. The Stewards had second deeds of trust on the ranch to secure Forester's purchase money notes to them. The Stewards owned no interest of any kind in the stock. The bank held the pledged stock and the first deed of trust on the ranch. Both secured Forester's $140,000 note to the bank. He had used the proceeds of the loan as part of the $260,000 purchase price of the ranch. Forester's notes to the bank and to the Stewards were in default.
 
 
 48
 In December 1971, with the assent of the bankruptcy court in Great Western's reorganization, the Stewards bid in the property at a nonjudicial sale under their power of sale in their second trust deed. They bid in for an amount less than the unpaid balance of Forester's notes to them. Their junior lien thereupon disappeared by merger, and they became owners of the ranch, subject to the bank's first deed of trust. (E.G., Anglo-California Bank v. Field (1905) 146 Cal. 644, 80 P. 1080.)
 
 
 49
 The Stewards found buyers for the ranch in late December 1971 at a gross sales price of $242,500. The sale could not be completed and escrow closed until the Stewards removed the encumbrance of the bank's first trust deed. Shortly before the escrow was set to close in April 1972, the bank told the Stewards that Forester's trustee in bankruptcy had made a written demand upon it to liquidate the stock and turn over the proceeds to him. On April 11, 1972, the Stewards made a written demand on the bank to apply the value of the stock to reduce Forester's indebtedness or, in the alternative, to pay the proceeds of the stock to them after the bank retired the stock. The bank refused the Stewards' demand, citing the trustee's demand.
 
 
 50
 The bank insisted that the Stewards pay it the full amount of Forester's indebtedness before it would relinquish its first trust deed. The Stewards closed their sale of the ranch on April 19, 1972. On April 21, 1972, the Stewards paid the entire indebtedness to the bank, using funds from their sale of the ranch. On May 15, 1972, the bank sent the trustee $7,000, representing the proceeds from the liquidation of the stock. The Stewards filed their reclamation petition on January 18, 1973.
 
 
 51
 Upon the Stewards' payment to the bank and the completion of their sale of the ranch to third persons, the Stewards had a deficiency of almost $100,000, representing the difference between the unpaid balance of Forester's purchase money notes and the net amount that they realized on the sale. The majority opinion softens the Stewards' financial blow by affirming the district court's order upholding their reclamation petition. Neither the facts of this case nor the applicable law sustains the majority's conclusion.
 
 
 52
 The majority holds the Stewards entitled to the proceeds of the stock under two different theories, the doctrine of equitable subrogation and that of marshaling assets, also with equitable antecedents. Under both headings the majority neglects or treats as ancillary aspects of the relevant law that undermine its reasoning and that express legislative assessments of the relative equities contrary to its own.
 
 
 53
 A basic premise of the majority opinion is that 'the trustee and through him the general creditors merely stand in Forester's shoes.' Majority Op'n at 315.) If the premise were sound, the majority's conclusion would be persuasive because the Stewards' equitable position was superior to Forester's throughout these proceedings. However, the premise is erroneous. The trustee in some respects represents the general creditors, but neither the creditors nor the trustee stand in Forester's shoes. The creditors and Forester are adversaries and for reasons discussed later, the Stewards' status is inferior to that of the general creditors. The trustee does not fit Forester's last. 'Under § 70a the trustee is vested with the title of the bankrupt to all of his property of whatever kind and wherever located at the date of the filing of the petition except that which is exempt. . . . The trustee takes such property not as a bona fide purchaser but in the dual role of a successor to the title of the bankrupt himself and of a creditor with a judgment, with an execution returned unsatisfied and one with a lien acquired through legal or equitable proceedings.' (4A Collier, supra, P70.04, at 60.) Proper treatment of the appropriate equities, then, does not begin with the Stewards in a superior position. Other considerations further reduce their equitable stature.
 
 
 54
 The majority's subrogation rationale overlooks the unique nature of the contested asset--stock in a Federal Land Bank--and the bankrupt's relation to it. (See infra at 321.)
 
 Marshaling
 
 55
 Forester's trustee had both the right and the duty to compel the bank to marshal assets for the benefit of the bankrupt's estate. The trustee had succeeded to Forester's redemption right in the stock, but the trustee had no lien on or interest in the ranch. Under California Civil Code Sections 2899 and 3433,[2] the trustee having an interest in the stock, but not in the ranch could require the bank first to resort to the ranch before it reached the stock because the bank had liens upon both assets. The trustee fulfilled his duty in March 1972, by demanding the bank to turn over the proceeds of the stock to him.
 
 
 56
 The Stewards also had a potential right to demand that the bank marshal assets for their benefit because they had an interest in the ranch, but not in the stock. Before they bid in the property, their right to demand marshaling rested on their status as junior lienors; thereafter, their right depended upon their ownership of the ranch subject to the first trust deed. I assume, arguendo, that they retained enough interest in the ranch after they had contracted to sell it to demand marshaling. Nevertheless, they made no demand of any kind to marshal until after the bankruptcies of both Great Western and Forester had intervened; they made no formal demand to marshal until April 1972, approximately three weeks after the trustee had made his demand and after they had contracted to sell the ranch.
 
 
 57
 The Stewards lose the marshaling contest because their demand for marshaling was later in time than the trustee's and their equities were inferior to those of the trustee.
 
 
 58
 Contrary to the suggestion of the majority, the Stewards' right to marshal did not 'vest' when they demanded marshaling in April 1972. A demand serves two purposes: (1) it gives the lienor or creditor notice of the claim, and (2) the date of the demand affects the relative priorities of those persons with whom the person making the demand is equitably competing for the same asset. The demand is an essential step in perfecting a right to marshal, good against a superior lienor or creditor upon whom the demand is made and against others who are also entitled to marshaling, but the demand does not itself create a lien or interest in any asset. A right to marshal does not ripen into an interest in the nature of an equitable lien until the court, applying equitable principles, enforces it. (See Harrington v. Taylor (1917) 176 Cal. 802, 807, 169 P. 690, 692; cf. Victor Gruen Associates, Inc. v. Glass (9th Cir. 1964) 338 F.2d 826.)
 
 
 59
 If the equities of the Stewards were equal to the trustees, the trustee would prevail over the Stewards because the trustee first asserted his claim to marshaling. (Smitton v. McCullough (1920) 182 Cal. 530, 189 P. 686; cf. Cal.Civ.Code § 2897.) If the bank had set off the value of the stock or paid the Stewards the proceeds after notice of the trustee's prior claim, the bank would have subjected itself to a risk of loss in an action against it by the trustee for failure of the bank to honor the trustee's marshaling demand and thus losing assets that should have been turned over to the trustee. Of course, the bank could have filed an interpleader action to protect itself, but the filing of such an action would also cause the bank to incur expenses. The marshaling doctrine will not be applied when to do so will cause a risk of loss to the person upon whom the demand to marshal has been made. (Victor Gruen Associates, Inc. v. Glass, supra, 338 F.2d 826.)
 
 
 60
 Apart from the prior demand by the trustee, and overcoming any expectation of the Stewards, the equities are unequal between Forester's general creditors, who are represented by the trustee, and the Stewards. California Code of Civil Procedure sections 580b and 580d prevented the Stewards from ever having had any expectation of reaching any asset to satisfy their purchase money notes other than the ranch. Their security was confined to the ranch, and, as vendors of the ranch holding Forester's purchase money notes, they were prevented by section 580b from seeking any deficiency judgment from him. More importantly, once they elected to bid in the property, they were foreclosed by section 580d from enforcing the notes.[3]
 
 
 61
 As holders of then unsecured notes, the Stewards were general creditors of Forester's, but they were general creditors who could not have filed a claim upon the notes in Forester's bankruptcy. If they were permitted to assert their claim to the proceeds of the stock, they would be allowed to accomplish in equity a circumvention of California's antideficiency statutes, a situation that equity would not countenance. The principal purpose of section 580b is to protect debtors in a falling real estate market by forcing creditors to look only to the property as security, leaving other assets of the debtor untouched. (Roseleaf Corp. v. Chierighino (1963) 59 Cal.2d 35, 42, 27 Cal.Rptr. 873, 877, 378 P.2d 97; see also Cornelison v. Kornbluth (1975) 15 Cal.3d 590, 125 Cal.Rptr. 557, 542 P.2d 981.) Similarly, section 580d prevents holders of deeds of trust who bid in and sell at a private sale from seeking a deficiency, putting judicial and nonjudicial sales on an approximate parity, while giving the vendor the chance to acquire a nonredeemable title. Allowing second lienors like the Stewards to reach assets like the stock herein would contravene the purpose of these antideficiency judgment statutes.
 
 
 62
 Finally, the effect of allowing the Stewards to compel marshaling would be to reduce the indebtedness against the land by resort to security for which they never expressly bargained at the expense of general creditors who were entitled to share in any of Forester's general assets.[4]
 
 Subrogation
 
 63
 California Civil Code section 2904, upon which the majority relies to justify the Stewards' subrogation to the bank's interest in the stock is inapplicable. That section applies only to inferior lienors' subrogation rights, and the Stewards had no lien on the ranch when they paid the bank. Their lien vanished when they bid in the ranch, and the lien cannot be revived, as the majority attempts to do, by saying that '(A)ll these steps . . . were taken to protect their second trust deed interest . . .' and that the 'ownership of the ranch by foreclosure of the second lien was but a contemporaneous step toward the payment of the bank loan and sale of the property.' (Majority Op'n at 314.) To be sure, the Stewards were trying to protect themselves from financial loss, but it is wrong to say that they took these steps to protect their second deed of trust. On the contrary, when they elected to bid in the property, they wiped out Forester's redemption right, and the price of that election was to extinguish their lien and to prevent any remedy on the notes. (Roseleaf Corp. v. Chierighino (1963) 59 Cal.2d 35, 43--44, 27 Cal.Rptr. 873, 878, 378 P.2d 97, 102.) Moreover, the Stewards' acquisition of the ranch and their payment of the bank were not 'contemporaneous'; they bid in the property in November and December 1971, and they did not pay the bank until close of escrow in April 1972.
 
 
 64
 Assuming, arguendo, that equitable subrogation may apply in California despite noncodification, that doctrine does not support the Stewards' claim to the proceeds of the stock. The Stewards' theory is that, upon payment of Forester's debt to the bank, they became entitled to the bank's security including the stock by equitable subrogation. The fundamental difficulty is that the law of California does not permit a person who acquires land subject to a mortgage or deed of trust to pay the debt and thereby to acquire any additional security that the mortgagor or trustor had received from his debtor. (McCarthy v. Kurkjian (1st Dist. 1924) 65 Cal.App. 569, 224 P. 1016.) The effect of the Stewards' payment of the bank was to extinguish both the debt and the first deed of trust. The Stewards could not have kept the bank's first deed of trust alive after they paid the debt, by the same token, they paid the debt; by the same token, the debt was paid. (McCarthy v. Kurkjian, supra, 65 Cal.App. at 574, 224 P. at 1018.) A fortiori, the Stewards cannot trace the proceeds of the stock after the pledge was extinguished, the stock was liquidated, and the proceeds paid to the trustee. Moreover, the Stewards' equitable situation vis-a-vis Forester's general creditors is no better under a subrogation theory than it was under the marshaling theory.
 
 Special Character of the Stock
 
 65
 The additional barrier to the Stewards' recovery is the peculiar nature of the stock that is in issue. Forester did not own the stock held by the land bank. The Association owned the bank stock, and the bank held it as security for its loan. Forester, as borrower, owned association stock, which was held by the Association as security. The land bank had no authority to assign its interest in this stock. (See generally 12 C.F.R. §§ 613--16 (1974), 12 C.F.R. § 610 (1970--72).) Because the bank's security interest was not assignable, the Stewards could not have acquired it by subrogation. (Cf. Fifield Manor v. Finston (1960) 54 Cal.2d 632, 639--40, 7 Cal.Rptr. 377, 381--82, 354 P.2d 1073, 1077--78.) The Stewards could not have acquired Forester's interest in the bank stock because he owned none. Since the Stewards could not be subrogated to the stock, they obviously have no basis at all to claim subrogation to the proceeds of the stock.
 
 
 66
 No injustice is done by depriving the Stewards of the $7,000. When they sold the ranch to Forester, they did not bargain for this additional security. As vendors, they had to be aware that Forester had no personal liability to them on the transaction, and they were obliged to take the risk that, on default, the proceeds of any sale would not be enough to satisfy their purchase money notes. The risk proved to be greater than they may have anticipated, but their loss cannot be passed along in whole or in part to Forester's general creditors.
 
 
 67
 I would reverse.
 
 
 
 *
 Honorable Irving Hill, United States District Judge for the Central District of California, sitting by designation
 
 
 [1]
 The source of the $7,000 was as follows:
 Forester joined the Federal Land Bank Association of Alturas by purchasing $7,000 in association stock representing 5 percent of the amount that the bank loaned to Forester. The association in turn purchased $7,000 in stock in the Federal Land Bank of Berkeley and pledged that stock with the bank to secure Forester's payment under his first deed of trust. Forester pledged his stock in the association with the association to hold it harmless in its pledge of the bank stock. The district court held that the bank had a perfected security interest in the stock as of July 1968. Had Forester fully paid his obligation under the first deed of trust, the bank would have redeemed the bank stock and paid $7,000 to the association. The association in turn would have redeemed its stock and paid $7,000 to Forester. Upon Forester's default the bank would have the right to apply the bank stock to the obligation before completing foreclosure of the land under the first deed of trust.
 
 
 [2]
 Forester had likewise made no payments to the Stewards on the second deed of trust and the Stewards paid several thousands of dollars in taxes and expenses applicable to the property to protect it. C.T. at 58
 
 
 [3]
 The district court held:
 'The Referee in Bankruptcy holds, and the trustee contends, however, that subrogation is inappropriate because petitioners (the Stewards) were acting as volunteers when they paid off the Bank loan. This contention is not persuasive. Although no Bank foreclosure occurred in this matter, a call for foreclosure had taken place. Since petitioners possessed a Second Deed of Trust which was subordinate to the Bank's First Deed of Trust, payment of the bankrupt's loan was necessary to protect their interest in the real property.' C.T. at 213.
 
 
 [4]
 Although the payment was pursuant to an instruction to the escrow agent for distribution of funds, the legal consequences are not thereby altered
 
 
 [5]
 's 2903. Right of redemption; subrogation
 'Every person, having an interest in property subject to a lien, has a right to redeem it from the lien, at any time after the claim is due, and before his right of redemption is foreclosed, and, by such redemption, becomes subrogated to all the benefits of the lien, as against all owners of other interests in the property, except in so far as he was bound to make such redemption for their benefit.'
 
 
 [1]
 For the purpose of this phase of the discussion, I treat the Association and the bank as if they were a single entity, the bank, and the stock as if it were owned by the bank
 
 
 [2]
 Cal.Civ.Code § 3433 (West 1954) provides:
 'Relative Rights of Different Creditors. Where a creditor is entitled to resort to each of several funds for the satisfaction of his claim, and another person has an interest in, or is entitled as a creditor to resort to some, but not all of them, the latter may require the former to seek satisfaction from those funds to which the latter has no such claim, so far as it can be done without impairing the right of the former to complete satisfaction, and without doing injustice to third persons.'
 
 
 [3]
 Cal.Code Civ.P. § 580d (West 1954) provides:
 'No judgment shall be rendered for any deficiency upon a note secured by a deed of trust or mortgage upon real property hereafter executed in any case in which the real property has been sold by the mortgagee or trustee under power of sale contained in such mortgage or deed of trust.'
 The purposes and effects of section 580d are discussed in Hetland, 'Deficiency Judgment Limitations in California--a New Judicial Approach,' 51 Cal.L.Rev. 1, 28--34 (1963).
 
 
 [4]
 The marshaling rule itself affects the Stewards' equities. Section 580b of the California Code of Civil Procedure (see supra) prevents purchase money lenders from seeking a deficiency judgment after the sale of the real property securing the debt. This provision has as one goal the imposition of the burden of risk of overvaluation of the property on the seller. (Roseleaf Corp. v. Chierighino (1963) 59 Cal.2d 35, 42, 27 Cal.Rptr. 873, 877, 378 P.2d 97, 101.) The purchase money lender with a first trust deed negotiates the terms of the sale, including the interest rate, which reflects his estimate of the probability of loss. The marshaling doctrine may slightly alter the calculation for holders of junior trust deeds who are also vendors. To the extent that this lienor is concerned about nonpayment on the first trust deed, thereby throwing the burden of paying the notes on the one who bids in, the expectation of aid from additional collateral should lower the interest rate. The lienor may thus rely on the doctrine in setting the terms of the sale. This reliance factor, which may be disproved in a particular case, entitles the lienor to some equitable consideration
 The majority, relying on Freedland v. Greco (1955) 45 Cal.2d 462, 289 P.2d 463, state that '(a) mortgagee may pursue additional security given by the mortgagor if the primary security is insufficient to satisfy the obligation.' The question is given to whom: In Freedland, the additional security was given to the first lienor; Forester gave only the trust deed to the Stewards unless they are subrogated to the bank's rights. We show infra that they are not. Additionally, the Freedland court denied the creditor the right to a deficiency judgment on the additional security after he had bid in and sold the real property and foreclosed on the personal property.