**In re C.F. SIMONIN'S SONS, INC., Debtor.**

**Bankruptcy No. S–83–00334–5.**

United States Bankruptcy Court, E.D. North Carolina.

March 7, 1983.

J. Larkin Pahl, Raleigh, N.C., for debtor.

Will H. Lassiter, III, Rocky Mount, N.C., for respondent, First Pennsylvania Bank, N.A.

## MEMORANDUM OPINION

A. THOMAS SMALL, Bankruptcy Judge.

This matter is before the Court upon the application of the Debtor, C.F. Simonin's Sons, Inc., to use cash collateral pledged to secure loans from First Pennsylvania Bank, N.A. A hearing was held in Raleigh, North Carolina on March 3, 1983.

## FACTS

C.F. Simonin's Sons, Inc., is a debtor-in-possession under chapter 11 of the Bankruptcy Code, having filed a voluntary petition on February 18, 1983. The present owners of the Debtor are: Southern of Rocky Mount, Inc., (90%); three brothers, McNair Evans (2½%), Hervey Evans (2½%), and Murphy Evans (2½%); and the estate of the father of the three Evans brothers (2½%). Southern of Rocky Mount, Inc., is a debtor under chapter 11 in a case pending in this Court (Case No. S–83–00294–8), having filed a voluntary petition on February 15, 1983. Southern of Rocky Mount, Inc., and its parent, Laurinburg Oil Company d/b/a Maxton Oil Company are major suppliers to the Debtor of cottonseed oil. The three Evans brothers have a substantial ownership interest in Laurinburg Oil Company.

### Operations

C.F. Simonin's Sons, Inc., founded in 1875 in Philadelphia, Pennsylvania, is a producer of edible vegetable oil which it sells to the snack food, salad dressing and baking industries. Its products include soybean oil (60% of sales), cottonseed oil (25% of sales), peanut oil, coconut oil and corn oil.

Raw vegetable oil is purchased by the company in bulk and can be received at the company's plant in Philadelphia within twenty-four hours of order if delivered by tank truck. Purchases of raw oil are not made by the Debtor unless the company has received advance purchase orders for the finished product. Present short-term advance purchase orders amount to $288,-000.00. Outstanding long-term purchase contracts total $2,400,000.00.

The oil is processed by the company in less than forty-eight hours. The refined product then is either loaded in tank cars for bulk shipment or packaged in one to five gallon containers. Shipments to purchasers are made by rail and truck.

The Debtor has a good reputation in the industry, has a reliable source of inventory, and sells to high quality, credit worthy customers. The company employs twenty-six semi-skilled, unionized laborers and eight non-union administrators.

### Plant and Facilities

The company's plant location in Philadelphia is, as described by its banker, "great." The buildings and equipment, which cover a 2.1 acre block, however, are less than "great"; they are old and in disrepair. Although the facilities, according to one of the Debtor's officers, are "suitable", major capital improvements are needed. The plant is protected by a security fence and two workers who tend the boiler serve as night watchmen. The buildings, which were built at the turn of the century, will not suffer further depreciation in the next few months.

### Profits and Losses

The plant location may be "great" and the facilities "suitable," but earnings are non-existent. The company has lost money in each of the last six and in seven out of the last eight years. Losses for the fiscal years ending on July 31 are:

| | | |
|---|---|---|
| 1975 | $723,000 | loss |
| 1976 | 195,000 | profit |
| 1977 | 406,000 | loss |
| 1978 | 144,000 | loss |
| 1979 | 344,000 | loss |
| 1980 | 357,000 | loss |
| 1981 | 316,000 | loss |
| 1982 | 419,000 | loss |

Losses have continued at an even higher rate since July 31, 1982:

| | | |
|---|---|---|
| August | $ 51,000 | loss |
| September | 63,000 | loss |
| October | 69,000 | loss |
| November | 82,000 | loss |
| December | 77,000 | loss |

### Bank Loans

In 1979, the Debtor's owners, in an attempt to reverse the company's negative earnings trend, brought in new management. In addition, the Debtor arranged two loans with First Pennsylvania Bank, N.A., for the purpose of generating working capital. The two loans were originally in the amounts of $750,000.00 and $1,500,-000.00.

The $750,000.00 loan is an eight year term loan requiring quarterly principal payments. Interest at the rate of the bank's prime lending rate plus 3% is payable monthly.

The $1,500,000.00 loan is a revolving loan under which the bank makes advances based upon loan balance to collateral value ratios—85% of accounts, 70% of raw oil inventory and 60% of finished product.

The balance outstanding under the two loans as of February 18, 1983, the date of the Debtor's filing, is $1,635,447.20. The Debtor is also indebted to the bank for an overdraft of $2,279.31 and has contingent liability for a standby letter of credit issued for the Debtor's benefit in the amount of $200,000.00. The total indebtedness, including the overdraft and the contingent liability for the letter of credit of the Debtor to the bank is $1,837,726.58.

### Collateral and Guarantees

The obligations of the Debtor to the bank are secured by the Debtor's inventory, accounts, equipment and real property. Additionally, the indebtedness is secured by marketable securities owned by the three Evans brothers. The loans from the bank are guaranteed by the Evans brothers, Southern of Rocky Mount, Inc., and Laurinburg Oil Company. The $750,000.00 term loan has the 90% guarantee of the United States Economic Development Administration.

### Collateral Values

The company's account debtors make payments directly to First Pennsylvania Bank, N.A., pursuant to a lockbox arrangement between the Debtor and the bank. The amount of cash now in the lockbox is $293,784.07.

The Debtor contends that the remaining accounts have a value of $604,000.00, net of a $118,000.00 reserve for losses. The bank contends that the accounts have a value of $507,658.79. The difference in the two positions concerns possible offsets between the Debtor and account debtors and the worth of intracompany accounts. For the purpose of this proceeding, the value of the accounts is found to be $507,658.79.

There is also a difference of opinion as to the value of the inventory. The Debtor attributes a $250,000.00 value to its oil inventory while the bank's evidence shows a value of $47,846.18 exclusive of by-products, manufacturing supplies and packaging supplies which the bank says are unsalable. For the purposes of this proceeding, the value of inventory is found to be $47,146.13.

The value of the marketable securities pledged to the bank by the three Evans brothers is $403,000.00.

The Debtor and bank are in sharp disagreement over the value of the plant, equipment and real property. McNair Evans testifying for the Debtor said that even though all of the company's assets were bought for $200,000.00 in 1972, the value of the plant is now in excess of $1,000,000.00. The bank in assigning only a $200,000.00 value to the facilities contends that because of the age, state of disrepair, and single purpose of the buildings, they are a liability and the cost of demolition must be deducted from the value of the real property. Because of the Debtor's prior losses, the uncertain prospects for profitability in the future, and the limited use of the plant, for the purposes of this proceeding, the value of the plant, equipment and real property is $200,000.00.

*Possibility of Reorganization*

The bank argues that based on the company's performance over the past eight years, there is no chance of rehabilitation. The bank also argues that since there is only one other independent manufacturer of edible vegetable oil in the Northeast, chances of a sale of the business as a going concern are remote.

The Debtor maintains that the business can be profitable and points to lower interest rates, lower fuel costs, renegotiation of the union contract, rejection of unprofitable long term contracts, better production scheduling, the proposed purchase of a more efficient boiler and personnel cutbacks. The Debtor, however, offers no specific projections to illustrate future profitability. The best the company's chief executive officer could predict was that the company would be operating at a breakeven basis in six months.

Mr. McNair Evans indicated that the company's owners were pursuing several possible purchasers as well as trying to renegotiate a new financing arrangement which would include both the Debtor and its parent, Southern of Rocky Mount, Inc.

While the possibility of a successful reorganization through increased plant efficiencies or sale of the business as a going concern does exist, realistically, the chances for reorganization appear at this time to be remote.

*Use of Cash Collateral*

On February 24, 1983, the Debtor filed an application seeking an *ex parte* order to use cash collateral. An in chambers conference with counsel for the Debtor and the bank resulted in the bank's consent to use $13,178.92 of cash collateral to pay the union payroll which came due that afternoon.

Four days later on February 28, 1983, an in chambers telephone conference with counsel for the Debtor and the bank resulted in an agreement permitting the use of cash collateral in the amount of $19,026.00 to purchase fuel, to pay insurance premiums and to pay seven of the eight company officers. It was further agreed that the

Bank would receive a security interest in two post-petition accounts as adequate protection for the use of the cash collateral.

## CONCLUSIONS

*Use of Cash Collateral*

■ The Debtor asks to be allowed to use the cash proceeds of its accounts. The accounts are, however, pledged to secure the Debtor's obligations to the Bank. Any cash proceeds from accounts existing at the time of the Debtor's filing are considered "cash collateral" 11 U.S.C. § 363(a). A debtor may not use cash collateral unless: (1) the secured creditor consents (11 U.S.C. § 363(c)(2)(A)); or (2) the court, after notice and a hearing, authorizes such use (11 U.S.C. § 363(c)(2)(B)). In considering whether to authorize use of cash collateral, the Court must be sure that the interests of the holder of the secured claim are adequately protected. The bank has not consented to further use of the cash collateral and has vigorously opposed Court authorization of its use. This Court must decide whether the Debtor's use of the bank's cash collateral is adequately protected. Before reaching that question, however, the Court should consider whether there is no reasonable chance of reorganization, for if there be none, there is no point in jeopardizing the bank's cash collateral.

*Inability to Reorganize*

■ The Bank argues that the Debtor should not be able to use cash collateral because it has no chance of reorganization.

It is too early in this case to conclude that there is no prospect of reorganization. The Debtor has offered no projections to indicate how the business can be rehabilitated, but specific details of a debtor's reorganization are not required at the earliest stages of a chapter 11 case. As the case progresses, the Debtor will have a stricter burden to prove that there exists a reasonable chance of success. For now, the Debtor's broad outline of decreased costs and prospects of sale are sufficient.

■ It is clear, that the Debtor's chance of successful reorganization is highly speculative. Almost all chapter 11 cases, however, involve an element of risk. A high degree of uncertainty is a factor to be considered in evaluating the secured creditor's adequate protection.

*Equity Cushion*

■ The Debtor maintains that the value of all the bank's collateral exceeds the amount of the indebtedness and that this "equity cushion" constitutes the Bank's adequate protection. In fact, there is no equity cushion. The value of the collateral is less than the indebtedness. Because there is no equity, the Bank is no longer entitled to interest on its claim. (11 U.S.C. §§ 506(b) and 502(b)(2)). But, what about the full guarantee of the Evans brothers; is that adequate protection for the bank? The testimony concerning the value of the Evans' personal guarantees was at best sketchy. Even if there was indisputable evidence of the creditworthiness of the guarantors, the chance to pursue a guarantor with its uncertainties and costs is not adequate protection. *In re Kenny Kar Leasing, Inc.*, 5 B.R. 304, 6 B.C.D. 677 (Bkrtcy.C.D. CA 1980). It is certainly not adequate protection in this case in view of the Debtor's remote chance of successful reorganization.

■ The guaranty of the United States Economic Development Administration is also not adequate protection for the bank. The bank is only partially protected by the 90% EDA guaranty and with respect to that part, the EDA would be entitled to adequate protection as subrogee to the interest of the bank.

*Adequate Protection for Cash Collateral*

■ There are, of course, other forms of adequate protection besides an "equity cushion." Prior to the filing of the Debtor's petition, the bank was willing to let the Debtor use its "cash collateral" as long as the loan to collateral ratios were met. According to the loan's formula, each 85¢ of cash advanced was protected by $1.00 of "eligible" accounts receivable. Is the bank any less protected by that formula after the filing of the chapter 11 petition than it was before? Since the Debtor now has the protection of chapter 11 and is subject to the jurisdiction of the bankruptcy court, the bank's position should now be more secure. The bank's interest, therefore can be adequately protected by substituting $1.00 of "eligible" accounts as defined in the loan documents for every 85¢ of cash released to the Debtor.

*Adequate Protection for Other Collateral*

The bank, in addition to adequate protection for its cash collateral, is also entitled to adequate protection for its other security interests.

■ The plant and equipment are old and in disrepair. There is no evidence that if the plant continues in operation that there will be further deterioration. In fact, since some of the employees serve as security guards and continued operation may enhance the possibility, albeit remote, of a sale as a going concern, continued operation may be necessary to maintain or increase the plant's value. The plant must be insured and provision made for the payment of *ad valorem* taxes.

■ The bank's security interest in the Debtor's uncollected accounts is adequately protected if the Debtor pursues collection. The bank could do no more. Furthermore, since the proceeds from the accounts are funneled through the bank's lockbox, the bank has physical control of the cash proceeds.

■ The bank's security interest in inventory is not diminished in value if the Debtor provides adequate inventory reports to the bank, delivers to the bank copies of all sales invoices, and utilizes the lockbox for collection of the resulting accounts.

■ The bank need not be given adequate protection for its security interest in the marketable securities owned by the Evans brothers as that property is not property of the Debtor's estate 11 U.S.C. § 541(a).

## Lost Opportunity Costs

There is a split of authority on whether a secured creditor's lost opportunity costs must be adequately protected. *In re American Mariner Industries, Inc.,* 10 B.R. 711 (Bkrtcy.C.D. CA 1981) and *In re South Villages, Inc.,* 25 B.R. 987, 9 B.C.D. 1332 (Bkrtcy.D.Utah 1982) say lost opportunity costs need not be protected. *In re Anchorage Boat Sales, Inc.,* 4 B.R. 635 (E.D.N.Y. 1980) says that interest on collateral values should be protected.

In the present case there would be no lost opportunity cost with respect to the "cash collateral" in the lockbox as the bank has the same opportunity to use those funds as it would have with respect to any customer deposits it receives.

The bank would also not have lost opportunity costs in connection with the uncollected accounts. All collections of the accounts are deposited into the lockbox. If the bank were collecting the accounts itself, it could not receive the cash proceeds any faster.

The bank does, however, have lost opportunity costs in connection with the cash it must turnover to the Debtor when replaced by "eligible" accounts. Also, if there were no automatic stay, the bank could realize the liquidation value of the plant, i.e., $200,000.00, and the inventory, i.e., $47,846.18.

■ While protection for lost opportunity costs for going concern values may not be required in cases with a high chance of success, liquidation values, including lost opportunity costs, must be protected in cases where the chance of reorganization is slight.

■ Consequently, the bank's adequate protection must include payment of lost opportunity costs on $247,840.18 plus on any cash collateral used by the Debtor. In this case, lost opportunity costs shall be compensated at the rate agreed upon by the parties in the loan transaction, prime plus 3%.

## Other Adequate Protection

Given the highly speculative character of this reorganization, the bank's adequate protection should include other safeguards in addition to those previously stated. The bank's adequate protection shall include:

1. Replacement for every 85¢ of cash collateral used by $1.00 of "eligible" accounts as defined in the loan documents.

2. Interest payable monthly at the rate of the bank's prime rate plus 3% on a balance of $247,840.18 plus any cash collateral used by the Debtor.

3. The Debtor will continue to use the lockbox arrangement with the bank for all accounts pledged to the bank.

4. The Debtor shall furnish to the bank the same reports which it furnished prior to the filing of its petition and shall also provide any other reports that the bank shall reasonably request.

5. The Debtor shall within 30 days prepare and deliver to the bank projections showing anticipated profits and cash flow for the next six months.

6. The Debtor may only use cash collateral to meet payrolls, purchase fuel, purchase inventory for which there exist confirmed purchase orders, pay for utilities, pay insurance premiums, pay interest payments and other items directly related to production.

7. The Debtor must keep the building and equipment insured and make provisions to pay *ad valorem* taxes. The bank shall have access to the property at any reasonable time.

8. The Debtor must actively pursue efforts to refinance its indebtedness and to sell the business as a going concern. The Debtor must keep the bank advised of these efforts.

9. The bank shall be allowed to apply to the Court for a termination of the use of cash collateral should circumstances materially change and upon five days notice to the Debtor, a hearing will be held to consider the bank's application.

10. The Court shall review the Debtor's use of the cash collateral in 30 days and may hold a hearing for that purpose.

The adequate protection required in this case may severely limit the Debtor's operations. Nevertheless, it would be wrong to let the Debtor, who has nothing to lose, gamble with the bank's cash collateral.

An appropriate order shall be entered.