In re Harvey D. SHEEHAN and Andrea L. Sheehan, d/b/a J.E.S. Farms, a sole proprietorship, Debtors.

**Bankruptcy No. 384–00013.**

United States Bankruptcy Court, D. South Dakota.

March 30, 1984.

As Amended June 22, 1984.

James P. Hurley, Bangs, McCullen, Butler, Foye & Simmons, Rapid City, S.D., for debtors Harvey D. Sheehan and Andrea L. Sheehan, d/b/a J.E.S. Farms.

Robert E. Hayes, Davenport, Evans, Hurwitz & Smith, Sioux Falls, S.D., for creditor Prudential Ins. Co.

Steven W. Sanford, Cadwell, Sanford & Deibert, Sioux Falls, S.D., for creditor Wells Fargo Ag Credit Corp.

John S. Lovald, Duncan, Olinger, Srstka, Lovald & Robbennolt, P.C., Pierre, S.D., for creditors Agland, Inc. and Agri-Management.

Steven L. Zinter, Schmidt, Schroyer, Colwill & Zinter, P.C., Pierre, S.D., for credit BankWest, N/A.

## MEMORANDUM DECISION

PEDER K. ECKER, Bankruptcy Judge.

The above-entitled debtors filed their petition in bankruptcy under chapter 11 on February 23, 1984, at 10:06 a.m. *See* 11 U.S.C. § 1101 *et seq.* The debtors are farmers and ranchers doing business on a 16,703-acre agricultural operation near Pierre, South Dakota. Around 12,250 acres of the debtors' land are under irrigation provided by 12½ miles of canals, over 50 miles of underground pipe, and 92 pivot systems which draw water from the massive Oahe Reservoir which borders the western edge of the farm. Corn, popcorn, soybeans, wheat, oats, and hay are among the crops produced, with an emphasis on irrigated corn. In addition to farming, the debtors have engaged in a substantial livestock business, owning up to 5,000 head at times. A substantial grain drying and handling center facilitates processing and storing the annual crop.

The Prudential Insurance Company of America (Prudential) financed the construction of the multi-million-dollar irrigation project which was begun in 1979. The Chemical Bank of New York provided the debtors' operating line of credit in 1981. Wells Fargo Ag Credit Corp. (Wells) advanced the operating line in 1982 and 1983 and has at least considered extending the 1984 operating line since the Fall of 1983.

The debtors filed a motion and proposed order for an expedited hearing on the use of cash collateral and a motion for the use of cash collateral with the Court on March 19, 1984. The Court signed the order granting an expedited hearing and debtors' counsel personally served local counsel for Wells and Prudential with the necessary documentation late on the afternoon of March 19. The court order set the hearing in Sioux Falls, South Dakota, on Thursday, March 22, at 4:30 p.m., thus giving the debtors' major creditors 72 hours' notice of the impending hearing. Counsel for Wells filed a nine-page resistance to the expedited hearing on the use of cash collateral on March 20. Prudential filed a resistance to the expedited hearing on March 21, stating

that local counsel for Prudential, Robert E. Hayes, would be in California until the morning of the hearing and, consequently, would be unable to prepare, and Prudential otherwise generally joined in the resistance filed by Wells on March 20.

This matter presents two important issues for resolution:

I. Whether the Court, under all the facts and circumstances, erred by granting the debtors' motion for an expedited preliminary hearing on the use of cash collateral on 72 hours' notice to the objecting parties in interest; and

II. Whether the interests of Wells and Prudential will be adequately protected under the debtors' proposed use of cash collateral.

### ISSUE I:

█ Wells and Prudential have argued that 72 hours' notice is insufficient to adequately prepare for a hearing involving complex legal issues and that such short notice impairs the availability of witnesses. Counsel for Prudential has indicated that he was in California attending a seminar and did not return to Sioux Falls until the morning of the expedited hearing. Wells and Prudential emphasize that the instant case is a large and complicated bankruptcy that presents several issues of first impression. Wells further indicates that its counsel has spent considerable time negotiating post-petition credit possibilities with the debtors to its prejudice in that it did not know that the debtors were contemplating an expedited hearing on the use of cash collateral. Wells and Prudential point to the current constitutional crisis confronting bankruptcy courts and contend that the Court would be wise to refrain from acting on the debtors' motion until Congress acts to rectify the jurisdictional problem. Finally, Wells claims that a prior court order entered by the Court on its own motion misled Wells to believe that the subject of financing would be heard in Pierre on April 4, 1984, at a time that would be non-prejudicial.

Notice and hearing under title 11 of the United States Code is governed by section 102(1) which, among other things, prescribes "notice as is appropriate in the particular circumstances, and such opportunity for a hearing as is appropriate in the particular circumstances." *See* 11 U.S.C. § 102(1)(A). A chapter 11 debtor in possession has substantially the same powers and duties as a "trustee." *See* 11 U.S.C. § 1107(a). A debtor in possession may not use, sell, or lease cash collateral as defined in 11 U.S.C. § 363(a) unless each entity that has an interest in such cash collateral consents, 11 U.S.C. § 363(c)(2)(A), or the Court, after notice and hearing, authorizes use within the applicable provisions of 11 U.S.C. § 363. *See* 11 U.S.C. § 363(c)(2)(A) and (B). Any hearing on the use of cash collateral may be a preliminary hearing but *"shall be scheduled in accordance with the needs of the debtor." See* 11 U.S.C. § 363(c)(3) (emphasis added). The Court may authorize use of cash collateral subsequent to a preliminary hearing only if there is a reasonable likelihood that the debtor will prevail at a final hearing, but *the court shall act promptly on any request for the use of cash collateral* (emphasis added). Local Rule of Bankruptcy Procedure 15(c) provides for expedited hearings on 48 hours' notice to parties in interest for the proposed use, sale, or lease of property. *See* Addendum No. 1 to General Order in Bankruptcy 15(c) (Bkrtcy.D.S.D. Jan. 28, 1980).

The Court is not persuaded by the creditors' resistances to hearing the debtors' motion for the use of cash collateral on an expedited basis. Both counsel for Prudential and Wells are very capable and experienced bankruptcy and commercial lawyers. Both are intimately familiar with the Bankruptcy Code, Rules, Local Court Rules, and the Court's procedure in cash collateral matters. Each counsel, as well as the Court, is fully cognizant of the need to resolve several disputes to allow proper preparation for and implementation of spring planting. In fact, Prudential moved the Court for the appointment of an operat-

ing trustee on February 24, 1984, only one day after the debtors filed their petition in bankruptcy, stating in its motion at paragraph "C" that:

It is vital that arrangements be made for the financing of crops during the upcoming season, and for the management and labor necessary to insure planting and farming of the real property of the Debtors in a manner consistent with good husbandry; and, although such needs are urgent, the Debtors will be unable to obtain sufficient financing to permit the timely and proper operation of their farm.

The Court made time to hear Prudential's motion to appoint a trustee on the night of March 6, 1984. Although the Court eventually directed a verdict against Prudential that evening, it is undisputed that Prudential and Wells, whose counsel was also in attendance that night, are fully aware of the importance of handling some matters in this bankruptcy on an expedited basis.

Counsel for Prudential and Wells knew that the instant case was a multi-million-dollar farm bankruptcy when they were retained by their clients. Everyone, including the Court, is well aware that the 1984 farm season and the necessity of preparing for it is imminent and the further possibility that use of cash collateral would be the debtors' only alternate source of post-petition financing if efforts to obtain a voluntary post-petition lender were delayed or proved unsuccessful. A 16,000-plus-acre farm needs capital to operate, and, as the debtors' motions with attachments, testimony at the instant hearing, and the farm plan admitted as debtors' exhibit 16 clearly indicate, the time to prepare for the 1984 crop is due or past-due.

This Court has literally been inundated with motions for expedited hearings for the use of cash collateral, many brought on by farmers unable to obtain 1984 operating credit, and has scheduled the same at four court points late into the evening according to the mandate of 11 U.S.C. § 363(c)(3). The Code's expressed requirement that hearings on the use of cash collateral be scheduled according to the needs of the debtor and acted on promptly by the court is not an accident. It reflects an acute awareness of the necessity of timely obtaining cash from what is often the only source available to operate a business in reorganization bankruptcy.

The impending jurisdictional crisis facing bankruptcy courts, contrary to the contentions of Prudential and Wells, is a compelling reason to act promptly but prudently prior to April 1, 1984. No one will be served by rusting center pivots and irrigated fields grown to weeds, a likely possibility if some form of operating capital is not obtained. Moreover, any allegation that the Court's order of March 13, 1984, misled Wells or Prudential into believing that a cash collateral hearing would be held in Pierre, South Dakota, on April 4, 1984, is totally without foundation. The Court's order clearly addresses a motion to obtain post-petition credit as contemplated by 11 U.S.C. § 364; a motion for the use of cash collateral pursuant to 11 U.S.C. § 363 is neither addressed nor implied. In any event, communication with counsel for Wells prior to entry of the order disclosed that the order contemplated the possibility of BankWest of Pierre, South Dakota, extending the 1984 operating line with the participation of an overline lender. The Court has made every effort to accommodate the interests of all the parties in this bankruptcy.

It should also be noted that the Court expressly stated at the beginning of the March 22, 1984, hearing on the use of cash collateral that it would not hear extensive testimony or argument in regard to 11 U.S.C. § 506 validity, priority, or extent of lien issues raised by the debtors' motion or Wells's motion for relief from the automatic stay attached to its response to the debtors' motion for the use of cash collateral. To this extent, Prudential's motion to strike filed at the hearing was granted, realizing, of course, that a motion for use of cash collateral must consider the existence or validity of a lien in a limited manner. Regardless, the issues raised by the debtors'

motion were narrowed considerably at the beginning of the hearing. In addition, neither Prudential nor Wells elaborated on how, if at all, they were prejudiced by short notice. Wells was missing some documents that concerned a collateral issue at best, and Prudential indicated that if its witness would have testified, they would have addressed the issue of equity in the debtors' real property, an issue expressly eliminated by the Court at the commencement of the hearing.

Finally, the Court has informed counsel by letter of March 26, 1984, that there will be a final hearing on the debtors' motion for use of cash collateral in Pierre, South Dakota, on April 4, 1984, at 1:00 p.m. This will give counsel the opportunity to make whatever additional record they wish as well as address two specific issues raised in the Court's letter dated March 26, 1984. Based on the foregoing discussion of the propriety of hearing the debtors' motion for the use of cash collateral on an expedited basis, this Court concludes that both Prudential and Wells were given sufficient notice to adequately prepare for the hearing under the Bankruptcy Code and Rules and, further, not deprived of their fifth amendment due process rights to fair notice and opportunity to prepare. *See Memphis Light, Gas and Water Division v. Craft,* 436 U.S. 1, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978).

ISSUE II:

■ The debtors project that they will soon possess approximately $4.7 million of cash collateral, which they concede is proceeds derived from the secured collateral of Wells. The debtors insist, however, under a variety of theories, that Prudential does not have a lien interest in the cash collateral. Moreover, they contend that no creditor has a lien interest in the 1984 crop, which, to date, has not been planted.

At the beginning of the March 22 hearing, the Court explained that it would not hear an 11 U.S.C. § 506 proceeding nor would it consider Wells's motion for relief from the automatic stay. While it is true that a proceeding to determine the validity, priority, and extent of liens is an adversary

proceeding under Bankr.R.P. 7001(2) as Prudential asserts in its motion to strike filed just prior to the March 22 hearing, it is undeniable that a motion for the use of cash collateral often requires a preliminary determination of secured status. As relates to lien interests in cash collateral derived from the 1983 crops and cattle, little problem exists. This Court often allows debtors to provide adequate protection for the use of cash collateral as the lien interests of creditors appear or as the interests may be subsequently determined. This method is both fair and expedient as long as all potential parties are given the opportunity to resist the motion and participate in any hearings and no immediate adequate protection payments are required. Consequently, as a preliminary matter, any adequate protection approved by the Court in the instant case will be awarded as lien interests appear.

The Court is understandably reluctant to determine lien interests within the confines of a motion for use of cash collateral. The Court, however, will and does make such determinations if the question involved is clear. Harvey Sheehan, one of the debtors, testified that no crops were presently planted or growing on his farm. Sheehan's testimony is uncontradicted. Subsection 552(a) of the Bankruptcy Code unequivocally states that existing security interests do not extend to after-acquired property arising post-petition. Moreover, 11 U.S.C. § 552(b) clearly does not make an exception for "crops" arising post-petition. Based on the clear mandate of 11 U.S.C. § 552, the Court concludes that Prudential does not have a lien interest in the debtors' 1984 crops. *See* 11 U.S.C. § 552(a) and (b); *In re Hamilton,* 18 B.R. 868, 871 (Bkrtcy.D. Col.1982).

■ If a party claiming an interest in cash collateral objects to a debtor's proposed use of cash collateral, the court may only allow the debtor to use cash collateral after notice and hearing and upon providing adequate protection of the creditor's interest. *See* 11 U.S.C. § 363(c)(2)(B) and (e). In any hearing on the use of cash collateral, the burden of proof on the issue

of adequate protection is on the debtor. *Id.* at (e); *In re Besler,* 19 B.R. 879 (Bkrtcy.D.S.D.1982).

Section 361 of the Bankruptcy Code prescribes three methods that may be used to provide adequate protection when it is required under the Bankruptcy Code. *See* 11 U.S.C. § 361. Subsection 361(1) contemplates periodic cash payments to the extent that an entity's interest in property decreases in value as it is utilized by the bankruptcy estate. Subsection 361(2) speaks to additional or replacement liens to the extent that, among others, the use of property under section 363 results in a decrease in the value of such entity's interest in such property. Finally, subsection 361(3) addresses the granting of such other relief, other than compensation as an administrative expense under section 503(b)(1), as will result in the realization of such entity of the indubitable equivalent of such entity's interest in such property.

The legislative history of section 361 provides some revealing guidance on what Congress had in mind when it promulgated the new Bankruptcy Code. H.R.Rep. No. 595, 95th Cong., 1st Sess. 338–40 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 49, 53–54 (1978), U.S.Code Cong. & Admin. News 1978, p. 5787. The methods of adequate protection specified in section 361 are based on fifth amendment constitutional grounds and on policy grounds as well. The methods prescribed are illustrative, define the contours of the concept, but are neither exclusive nor exhaustive. Although secured creditors should not be deprived of the benefit of their bargains, there may be situations in bankruptcy where giving a secured creditor an absolute right to its bargain may be impossible or seriously detrimental to the purpose behind the bankruptcy laws. The use of alternate means of protecting the value of a secured creditor's interest is recognized, so long as the creditor receives in value essentially what it bargained for. Subsection 361(3), speaking of the so-called "indubitable equivalent," defines the general concept of adequate protection by requiring such relief as will result in the realization of value. Congress intended adequate pro-

tection to be flexible to permit courts to adapt to varying circumstances and changing modes of financing. Finally, Congress expected that adequate protection would be further developed on a case-by-case basis by the courts.

The term, "indubitable equivalent," as it relates to adequate protection in bankruptcy, was coined by the now famous jurist, Judge Learned Hand, in a short but articulate circuit court decision decided under the old Bankruptcy Act in 1935. *In re Murel Holding Corp.,* 75 F.2d 941 (2d Cir.1935). The leading treatise on bankruptcy law explains that the statutory context and legislative history of section 361 indicate that something other than the "completely compensatory" and the "indubitable equivalent" tests may apply in determining whether adequate protection has been offered in each situation. 2 *Collier on Bankruptcy* ¶ 361.01[1] (15th ed. 1979). In addition, "adequate protection" standards are, at least arguably, less strict for interim matters as compared to the time for confirmation of a plan, when a creditor may be saddled with a long-term plan without future redress. *Id.*

Having related the basic legislative history of adequate protection as illustrated by 11 U.S.C. § 361, it should be noted that, although adequate protection is rooted in the fifth amendment's prohibition of taking private property for a public purpose without just compensation, the instant decision approaches adequate protection from a legislative intent or policy standard. This seems appropriate when considered in the light of United States Supreme Court decisions that uphold significant government impairment of private property rights without finding an impermissible taking under the fifth amendment. *See Wright v. Union Central Life Insurance Co.,* 311 U.S. 273, 61 S.Ct. 196, 85 L.Ed. 184 (1940) (a Supreme Court decision cited in the legislative history to 11 U.S.C. § 361 which was decided subsequent to *In re Murel Holding Corp.,* 75 F.2d 941 (2d Cir.1935)); *Wright v. Vinton Branch of Mountain Trust Bank of Roanoke,* 300 U.S. 440, 57

S.Ct. 556, 81 L.Ed. 736 (1937); *Penn. Cent. Transp. Co. v. New York City,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978); *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982); *Prune Yard Shopping Center v. Robins,* 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980); *Hodel v. Virginia Surface Mining and Reclamation Ass'n,* 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981) (*citing Kaiser Aetna v. United States,* 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979)); *Agins v. City of Triburon,* 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980). Whatever adequate protection is or must be, this Court is convinced that it compels a stricter standard than that imposed by the fifth amendment.

The debtors anticipate having approximately $4.7 million of cash collateral deposited in their D.I.P. (debtor in possession) account on or before April 1, 1984. Current obligations to Wells are $4.2—$4.3 million. Prudential, who subordinated its interest in the debtors' 1983 crops to Wells, claims a second lien in any cash collateral above Wells's lien interest. The debtors have submitted a budget that presents in reasonable detail their projected income, expenses, and cash flow during the next twelve months. Total farm and reorganization expenses are estimated at $3.8 million.[1] A net farm income of around $350,000 is anticipated. The debtors propose the following as adequate protection as interests in the cash collateral appear and to the extent that cash collateral is used:

(1) A detailed budget that anticipates reasonable expenses and conservatively projects crop prices and yields;

(2) A replacement lien in the 1984 crop which is yet to be planted;

(3) A replacement lien in any new equipment or vehicles purchased and insurance on the same;

(4) Payment of 16.5% interest on any cash collateral used with such interest anticipated in the twelve-month operating budget;

(5) All-risk crop insurance on 100% of the 1984 crop, the cost of which is figured in the debtors' twelve-month operating budget;

(6) The services of an experienced certified public accountant who is familiar with accounting for irrigated farming operations to supervise the day-to-day accounting and to provide detailed monthly statements to all parties in interest analyzing income, expenses, and cash flow;

(7) The right to reasonable inspection of the debtors' premises and business records at reasonable times and upon reasonable notice;[2]

(8) All hedges in the futures market must be "true hedges" that are made to lock in a profit with a daily position record supplied to all interested parties;[3]

(9) A new, professional, experienced, highly competent, and harmonious management team dedicated to making the debtors' reorganization work;

(10) At least ten (10) experienced farm and ranch employees committed to the debtors' reorganization effort; and

(11) Cash collateral will be deposited in highly solvent BankWest in Pierre, South Dakota, drawing interest until used.

The debtors presented testimony at the cash collateral hearing that explained their offer of adequate protection in considerable detail. Several witnesses, including a certified public accountant familiar with the

---

**1.** Although the debtors' motion for the use of cash collateral addresses the need for cash collateral to purchase cattle, the budget does not incorporate any income or expenses relating to cattle and no evidence was introduced at the March 22 cash collateral hearing disclosing the specifics of a cattle program. Consequently, the Court will only consider the use of cash collateral as it relates to the proposed grain program.

**2.** This is a standard court-imposed element of adequate protection.

**3.** *See* n. 2, *supra.*

debtors' operation, testified that the expenses projected in the budget were reasonable, while the anticipated income was conservative. Projected expenses are very similar to those projected by the debtors' former management team which served with the approval of Prudential and Wells. Commodity prices are figured at the federal loan rate, F.O.B. Pierre. Yields reflect independently verified county ASCS average yields. The bulk of the crop is irrigated, thus eliminating in large part the potential ill effects of drought. The irrigation system is a proven system that has been operating for at least three years. Cash collateral will be withdrawn from an interest-bearing account only as it is needed.

The debtors' crop income has always exceeded the costs of producing it, yielding a profit if the cost of servicing the large real estate debt is ignored. In previous years, the debtors only insured their crops for hail, but, this year, all-risk crop insurance will be purchased on 100% of the 1984 crops at an estimated cost of $180,000. Although the all-risk insurance covers any yield reductions resulting from "Acts of God," it does not cover poor farming practices. The insurance, if loss occurred, would pay most but probably not all of the expenses of production. Any crop loss, however, would certainly reduce other budgeted costs for irrigation, harvesting, grain drying, and the like. The debtors' certified public accountant has designed an efficient and effective accounting method which allows instant analysis of monthly and year-to-date income, expenses, and cash flows.

One of the debtors, Harvey Sheehan, will coordinate a new management team. Mr. Sheehan has been a farmer and rancher all his life. Prior to switching to more intensified irrigation farming in 1979–80, he managed a 38,000-acre dryland farming and cattle operation, supervising 27 employees, and generally immersing himself in the day-to-day operation of the business. Since 1979, he has been actively involved in the daily business of his present operation.

Thomas Tveit, an experienced agronomist, will assist the debtors in such areas as irrigation scheduling, pest management, crop planning, and fertility management. Mr. Tveit comes well recommended from numerous farmers and ranchers and recognized experts on farm irrigation. He has served as a court-approved operating trustee in a chapter 11 farm bankruptcy involving irrigated acres and continues to manage a portion of that estate for the benefit of the unsecured creditors. Tveit indicated that he was sure that he could work amicably with the debtors.

Pat Tracy, who has worked for the debtors since the inception of the irrigation project, will continue in his capacity as farm foreman. Tracy will supervise labor, chemical fertilizer, and seed acquisition and application, planting, equipment repair, irrigation scheduling, pest scouting, and harvesting. In addition, he will be primarily responsible for keeping the crop and irrigation records. Tracy has special training in electronics and is an experienced repairer of center pivot irrigation systems. He indicated a strong desire to see the debtors through their reorganization struggle.

Duane D. Butt, a local certified public accountant, will serve as the debtors' accountant, providing the necessary monthly reports and supervising the day-to-day bookkeeping which will be performed at the debtors' administrative office. Mr. Butt has many agricultural clients. He indicated that the debtors' projected income was conservative, that anticipated expenses were reasonable in comparison to prior years, and that the debtors had always generated a profit from their crops but, under prior practices, were unable to service a large real estate debt. He also indicated that the debtors planned to retain, with court approval, Dr. Mike Bolshe, an agricultural economist from Iowa State University who is a highly regarded specialist in corn marketing. Mr. Butt has known Dr. Bolshe for several years and indicated that they had on occasion worked together professionally.

Wells and Prudential have objected to the debtors' use of cash collateral and, simply put, insist that the debtors are not offering "adequate protection." More specifically, they contend: (1) that the mere expectancy of a 1984 crop does not provide them with an indubitable equivalent of their interests in the cash collateral; (2) that 1984 crops are not a "replacement lien" under 11 U.S.C. § 361(1); (3) that the debtors' management is new and untested; (4) that the debtors' budget is too tight, leaving too little margin for error; (5) that the debtors' proposal is nothing more than an involuntary unsecured loan which is not permissible under the Bankruptcy Code; (6) that the debtors may not have any machinery to operate their farm; (7) that there is no collateral quite like cash collateral; and, finally, (8) that the expedited hearing on cash collateral was done with inadequate notice, depriving the creditors of a reasonable opportunity to prepare, in violation of their constitutionally protected fifth amendment rights.

Wells submitted a trial memorandum at the expedited hearing and the Court has granted Prudential's oral motion to join in Wells's resistance to the debtors' motion. In its memo, which is confined to the legal issue of adequate protection, Wells emphasizes two decisions in support of its objection to the debtors' proposed use of cash collateral and offer of adequate protection. First, it contends that the holding in *In re Murel Holding Corp., supra*, precludes the Court from concluding that the debtors have offered adequate protection. *Murel*, however, is distinguishable from the case at bar in many ways. *Murel* is a 1935 case construing provisions of the Bankruptcy Act of 1898 as they related to a creditor's request for relief from the stay and a debtor's proposed plan of reorganization. The Court refused to consider a "cram-down" of a mortgage holder of an apartment house, explaining under the facts and circumstances of the case that a ten-year moratorium on payments was not "completely compensatory" nor the "indubitable equivalent" of the rights surrendered by the mortgagee. The Court refused to stay foreclosure of the mortgage based on the treatment offered the mortgagee in the debtor's plan. Moreover, the *Murel* Court noted that the plan was speculative and that the apartment house had not been profitable for several years.

In sharp contrast, the instant case arises out of a debtor's request for interim use of cash collateral under the provisions of the new Bankruptcy Code. The instant debtors have made a profit over and above their operating line every year for the last three years. The debtors' income projections are not "mere" speculation but rely on reasonable estimates of expenses and conservative income projections and are generally supported by their eleven-point offer of adequate protection. We agree with the Court in *In re Hollanger*, 15 B.R. 35, 46 (Bkrtcy.W.D.La.1981), that *In re Murel Holding Corp.* announces a legal conclusion rather than a legal test for resolving the often difficult question of whether a creditor is adequately protected. Consequently, while conceding that *Murel* is a famous statement of bankruptcy jurisprudence, this Court refuses to conclude that it provides a workable legal test to measure a debtor's offer of adequate protection or that its facts are sufficiently analogous to the instant case in any event.

Wells also relies heavily on *Matter of Schaller*, 27 B.R. 959 (D.C.W.D.Wis.1983), to support its argument that the debtors are not offering adequate protection. The *Schaller* Court upheld a bankruptcy court's refusal to find that an assignment of future farm income, among other things, was not adequate protection in an 11 U.S.C. § 362 stay proceeding. A close examination of this decision reveals that the adequate protection offer of future farm profits was not supported by any evidence that excess farm income would be available and, furthermore, the assignment was terminable at the option of the debtors. *Matter of Schaller, supra*, at 960. In comparison, the instant debtors have offered an eleven-point adequate protection plan anchored by a lien in their 1984 crops and supported by substantial testimony.

■ What is the legal test for determining whether an entity is adequately protected when a debtor proposes to use cash collateral in which the entity claims an interest? Admittedly, conclusory phrases such as "indubitable equivalent" and "completely compensatory" are, at best, of dubious assistance. Our system of courts contemplates that trial courts make decisions while, ultimately, appellate courts make the common law. This Court has been unable to find a workable legal test addressing the issue of whether a creditor's interest in cash collateral is being afforded adequate protection. Consequently, out of necessity, it proposes to use the following:

A party proposing to use cash collateral must prove by clear and convincing evidence that an entity claiming an interest in cash collateral will realize the value of its bargain in the light of all the facts and circumstances of the case.

This test is consistent with the legislative history of 11 U.S.C. § 361 discussed earlier in this opinion. It contemplates flexibility, a case-by-case balancing approach to what are usually highly factual matters, and, most importantly, places a high burden of proof on the party requesting the use of cash collateral.

■ In applying the foregoing test, some of the specific arguments presented by Wells and Prudential must be addressed. The debtors' 1984 crop will be more than an expectancy considered in light of the debtors' eleven-point adequate protection offer and the testimony supporting it. Cash collateral will be used as the debtors' crop needs present themselves. Both Wells and Prudential are huge agricultural creditors who are in the business of loaning money for farming purposes. Certainly, Wells did not consider itself "unsecured" in 1982 or 1983 when it extended the debtors' operating line of credit under a farm plan very similar to the debtors' 1984 plan. Little reason exists to support a contention that a lien in future crops is not a replacement lien. The issue is adequate protection; a new lien in the 1984 crops to the extent cash collateral is used is clearly a replacement lien.

The debtors' new management is tested. Every member of the new team is an experienced professional. Not all the team members are new. Harvey Sheehan was a functioning member of the prior management team. Pat Tracy, who performs the important job of ranch foreman, has been on the farm since the inception of the irrigation program. Duane Butt, a certified public accountant, performed at least some services for the debtors in the past and has experience providing accounting services for irrigated farms. Thomas Tveit is an agronomist who sports an impressive resume, comes well recommended from area irrigators, and has successfully served as an operating trustee in a chapter 11 farm bankruptcy. There was also some testimony that the debtors intended to retain a recognized expert in corn marketing to assist them. There is little in the record that impeaches the competency of the debtors' new management team or establishes its ability in relation to the prior management team that existed with Prudential's and Wells's approval. In fact, the Court is impressed with the quality of the new management team and recognizes the potential advantage of a "harmonious" team in contrast with the prior management structure.

The debtors' proposed budget is tight, but it represents a very reasonable estimation of expenses consistent with actual expenses incurred in prior years and projects income on the basis of floor level government loan prices and independently verifiable average crop yields. Considering the debtors' budget which projects about a ten per cent net profit from operations in the light of the total adequate protection package, the Court is unwilling to conclude that the budget is too tight.

Any court-authorized use of cash collateral over the objections of secured creditors is, in essence, an involuntary loan. The concept of using cash collateral under 11 U.S.C. § 363 recognizes a reorganizing debtor's need for cash to operate his business and, accordingly, provides for "invol-

untary" secured loans by allowing debtors to use cash collateral encumbered by the lien of another entity upon providing adequate protection.

There has been some discussion concerning the availability of machinery to put in the debtors' 1984 crops. There is a hearing scheduled next week involving this matter and, therefore, any determination at this juncture would be premature. In any event, the debtors' budget provides $195,-000 for machinery payments, a substantial sum that could be used to lease the machinery necessary to put in the 1984 crops.

The Court has already addressed Wells's and Prudential's contention that the expedited hearing on the use of cash collateral violated their fifth amendment due process rights and relies on its earlier analysis and conclusions.

The debtors' proposal is not unlike and, in fact, is more viable in some ways than the one approved in *In re C.F. Simonin's Sons, Inc.*, 28 B.R. 707 (Bkrtcy.E.D.N.C. 1983). Here, the court allowed the debtor to use cash collateral derived from the proceeds of accounts and held that the relevant creditor was adequately protected as long as every eighty-five cents of cash collateral was replaced with one dollar of new eligible accounts receivable. In addition, the debtor paid interest on the use of cash collateral at three percent over prime. The court noted that the debtor's business had lost money during each of its previous six years of operation and that, although the case had only recently been filed, the chances of a reorganization appeared dim. The court, however, emphasized that it had to consider the speculative nature of the debtor's reorganization possibilities when evaluating adequate protection. Subsequent to an analysis of all the facts and circumstances of the case, the court approved an eleven-point adequate protection proposal and allowed the use of cash collateral. *Id.* at 713–14.

The values of Wells's and Prudential's bargains are their claimed interests in the debtors' cash collateral. The debtors have proposed an eleven-point plan and sup-ported the same with substantial testimony designed to provide Wells and Prudential with the values of their bargains. The debtors propose using approximately $3.8 million of cash collateral during the next twelve months. A stiff 16.5% interest rate is incorporated into the debtors' budget. Although repayment is not contemplated until fall, this is a vagary of agricultural lending that both Wells and Prudential are familiar with.

Considering the legal test enunciated by the Court, the legislative history of 11 U.S.C. § 361, the available on-point case law, the debtors' eleven-point adequate protection offer and the testimony supporting it, all other testimony, and the arguments and briefs of counsel, the Court concludes that the debtors have proven by clear and convincing evidence that Prudential and Wells will be adequately protected for the debtors' use of $3.8 million of cash collateral. Consequently, there is a reasonable likelihood that the debtors will prevail at the final hearing on the debtors' motion for use of cash collateral scheduled in Pierre, South Dakota, on April 4, 1984.

The debtors, however, are instructed to use cash collateral only for those budgeted items that are, in their best business judgment, absolutely necessary for planting the 1984 crops. Expenses that can be avoided or postponed without incurring significant cost increases or otherwise impairing their ability to produce the 1984 crops should be avoided pending the April 4 final hearing. In the event, however, that the Bankruptcy Court is precluded from acting subsequent to March 31, 1984, due to congressional failure to timely remedy the jurisdictional problem facing all bankruptcy courts, the debtors are authorized to proceed within the guidelines of their proposed budget, bound by adequate protection requirements approved by this Court.

The Court has not authorized the use of any cash collateral for grain hedging. If the debtors desire to use cash collateral for this purpose, they should apply at a later date, keeping in mind that an acceptable market consultant will have to be retained

and approved by the Court and that any proposal must be consistent with the adequate protection as outlined in this decision.

The debtors' request to segregate $100,-000 of cash collateral into a separate interest-bearing account reserved to pay the fees and expenses of professional persons retained by the debtors is granted. It should be noted, however, that any payments for professional services must comply with the applicable provisions of the Bankruptcy Code and Rules. *See generally* 11 U.S.C. §§ 327, 328, 329, 330, and 331.

Finally, nothing in this decision precludes either Wells or Prudential from making application on any expedited basis available for protection of their claimed interests in any property of the estate.

All of the above constitutes the Court's findings of fact and conclusions of law in the above-entitled matter pursuant to Bankr.R.P. 7052 and F.R.Civ.P. 52. The Court will enter a judgment and order consistent with these findings of fact and conclusions of law in accordance with Bankr. R.P. 9021 but reserves the right to supplement or amend this memorandum decision and judgment and order subsequent to the final cash collateral hearing in Pierre, South Dakota, on April 4, 1984.