PREGERSON, Circuit Judge:
PACTS
On December 18, 1981, Center Wholesale, Inc., (Center) a building materials dealer, filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. On the same day, Center sent notice by Mailgram[1] to its ten largest creditors of a hearing on December 22, 1981, before the bankruptcy court for approval of a stipulation Center had entered into with Union Bank, Center’s secured lender.
Owens-Corning Fiberglas Corporation (Owens-Corning), Center’s largest creditor, received the mailgram on December 21, 1981, the day before the hearing. Owens-Corning states that it was unable to send counsel to the hearing, although one of its regional credit managers did attend.
At the end of the hearing, Bankruptcy Judge King signed a Cash Collateral Order (CCO) incorporating the terms of the stipulation. The CCO accomplished two basic goals:
(1) pursuant to 11 U.S.C. § 364(d),[2] the CCO permitted Center to borrow additional funds from Union Bank in exchange for granting the Bank a senior lien on all of Center’s pre-petition and post-petition property, and
(2) pursuant to 11 U.S.C. § 363(c),[3] the CCO permitted Center to use its cash collateral[4] to make payments to Union Bank, thereby gradually reducing Center’s indebtedness to the Bank.
At the date of filing the Chapter 11 petition, Union Bank had a senior lien on all of Center’s inventory[5] and Owens-Corning *1443 had a junior lien on Center's Owens-Corning inventory.[6] The CCO stated that “[t]he parties believe that [the CCO] does not affect the rights of any other lienholder,” and that Center “ratifies and affirms the validity, perfection and enforceability of all liens, security interests and encumbrances heretofore granted by [Center] to [Union Bank] without prejudice to the rights of any other party.” (Emphasis added.) Despite this clear language, Owens-Corning argues that the CCO did affect its security interest in Center’s Owens-Corning inventory and proceeds.
Owens-Corning asserts that, on the date of filing, Center owed Union Bank $990,-000; that Center owed Owens-Corning $1,400,000; that the collateral subject to Union Bank’s lien (all of Center’s inventory, including the Owens-Corning inventory) was worth $6,313,278; and that the portion of the collateral subject to Owens-Corning’s lien (Center’s Owens-Corning inventory) was worth $1,214,303.
To summarize these allegations:
Center’s Inventory: Other Goods Owens-Corning Total
Goods
Value of Collateral: $5,098,975 + $1,214,303 = $6,313,278
First Lienor
(amt. of debt): Bank--{$990,000) - Bank
Second Lienor
(amt. of debt): — Owens-Corning
($1,400,000)
Owens-Corning argues that the CCO improperly authorized Center to use the proceeds from the sale of Owens-Corning inventory (worth $1,214,303) to satisfy not only the Bank’s senior lien in the amount of $990,000, but also the additional debt incurred under the CCO. Based on the above allegations, Owens-Corning argues that the CCO thereby granted the Bank a senior lien on the portion of the inventory on which Owens-Corning previously was the sole lienor, i.e., $224,303 ($1,214,303 minus $990,000) worth of Center’s Owens-Corning inventory, effectively extinguishing Owens-Coming’s rights in the property.
On December 24, 1981, Center mailed to all of its creditors notice of a hearing on January 14, 1982, before Judge King “to consider the debtor’s application for approval of the continued effectiveness of a certain financing agreement between the debtor and Union Bank, the debtor’s general lender.” (Emphasis added.) Six days later, Center mailed the creditors a copy of the CCO.
Judge King held the hearing on January 14 to allow creditors who had not received notice of the December 22 hearing to express opposition to the CCO. Counsel for Owens-Corning attended the hearing and moved for a continuance on the ground that he had not had sufficient time to review the CCO. Judge King denied the motion for a continuance because he concluded that the CCO was a final order, subject to attack only by a Fed.R.Civ.P. 60(b) motion:
As I read this order: there is an order. There is nothing that seems to provide for a continued hearing. The notice says that there is to be an application for approval, but really it has already been approved. So, I think that the options that are open to creditors if they are unhappy are to take advantage of remedies provided in the approved stipulation; and if they feel that the approval was improvident or improper, then perhaps they can proceed under Rule 60(b) of the Federal Rules of Civil Procedure; but aside from that, I see nothing that can be done today, or any reason to set it for a future hearing.
On April 26, 1982, Owens-Corning filed a complaint against Center and Union Bank seeking reclamation of goods, declaration of a security interest, adequate protection of that interest, and related remedies. Pursuant to the procedure in the Northern District of California, this adversary proceeding was assigned to Judge Rainville, a bankruptcy judge different from the one presiding over the chapter proceeding (Judge King).
Center filed a motion for partial summary judgment in the adversary proceeding. *1444 On March 3, 1983, Judge Rainville entered a Corrected Amended Opinion and Order, granting Center’s motion for summary judgment in large part, but also holding that:
Owens-Corning Fiberglas Corporation does have a perfected lien as to the value of any Owens-Corning Corporation inventory and proceeds thereof in possession of Center Wholesale, Inc. as of the commencement of the chapter 11 case on December, 1981, less the amount of Union’s senior security interest on December, 1981, and less the amount of Owens-Corning Fiberglas Corporation’s inventory and proceeds paid to Union pursuant to the court’s cash collateral order dated December, 1981.
(Emphasis added.)
Owens-Corning- appealed Judge Rain-ville’s Opinion and Order to the District Court. On November 13, 1984, U.S. District Judge Conti affirmed Judge Rain-ville’s Corrected Amended Opinion and Order, holding that Owens-Corning did have a valid security interest in Center’s Owens-Corning inventory, but that the CCO properly permitted Center to use that inventory to pay off the Bank.
On June 15, 1983, approximately three months after Judge Rainville issued his Corrected Amended Opinion and Order, Owens-Corning brought a Rule 60(b) motion in the chapter proceeding before Judge King, alleging surprise, change of circumstances, and voidness, and seeking modification of the CCO to marshal liens as between Owens-Corning and the Bank.
Judge King held a hearing and entered an order denying Owens-Corning’s Rule 60(b) motion on the grounds that it was untimely and that the requested relief would prejudice the estate. Owens-Corning appealed to the district court, but the district court entered an order denying appeal and affirming the bankruptcy court. Owens-Corning then appealed to this court.
ISSUES
I. Whether and to what extent Owens-Corning had property rights that were affected by the CCO.
II. Whether Owens-Corning’s Rule 60(b) (4) motion was timely.
III. Whether Center’s notice of the hearing to approve the CCO satisfied due process.
STANDARDS OF REVIEW
In Northern Pipeline Const. Co. v. Marathon Pipe Line Co., 458 U.S. 50,102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), the Supreme Court invalidated the trial court jurisdiction accorded bankruptcy judges by the Bankruptcy Reform Act of 1978.[7] To prevent undue disruption, the Court held that the Marathon decision would not apply to judgments entered by bankruptcy judges before October 4, 1982. Id. at 88, 102 S.Ct. at 2880. The Court later extended this stay to December 24, 1982. 459 U.S. 813, 103 S.Ct. 200, 74 L.Ed.2d 60 (1982). In light of Marathon, we have held that a Bankruptcy Appellate Panel (BAP) may decide only those bankruptcy appeals involving judgments entered before the stay expired on December 24, 1982. In re Burley, 738 F.2d 981, 984 (9th Cir.1984).[8] Judgments and orders entered by bankruptcy judges after that date under the Emergency Rule[9] are not appealable to the BAP.[10] Id.
*1445 Burley’s significance on the standard of review is its effect on prior Ninth Circuit cases discussing this court’s review of BAP decisions. Because the district court replaced the BAP as the intermediate court in this ease,[11] our determinations as to the appropriate standards for reviewing BAP decisions should apply when we review the district court’s decision as well.[12]
We have consistently held that because this court is in as good a position as the BAP to review the findings of a bankruptcy judge, we independently review the bankruptcy judge’s decision without deferring to the BAP’s decision. See, e.g., In re Mellar, 734 F.2d 1396, 1399 (9th Cir.1984); In re Comer, 723 F.2d 737, 739 (9th Cir. 1984); In re Bialac, 712 F.2d 426, 429 (9th Cir.1983). Similarly, because we are in as good a position as was the district court to review Judge King’s denial of Owens-Corning’s Rule 60(b) motion, we review that decision de novo.
Whether Owens-Corning had property rights and to what extent those rights were affected by the CCO involve questions of fact that we review under the clearly erroneous standard. See id. However, because Judge King never made these crucial findings, we must remand to permit him to adopt Judge Rainville’s findings, if any, under the doctrine of collateral estoppel,[13] or make the findings himself.
The remaining issues — whether Owens-Corning can avail itself of the doctrine of marshaling to create or enlarge its property rights, whether Owens-Corning’s Rule 60(b) motion was timely, and whether the mailgram notice satisfied due process — involve questions of law that we review de novo. See id.
DISCUSSION
I. Whether and to what extent Owens-Corning had property rights affected by the CCO.
A. Valuation of Center’s Owens-Corning Inventory.
The Fifth Amendment provides that no person shall “be deprived of life, liberty, or property, without due process of law.” To have standing to bring a Rule 60(b) motion challenging the CCO on due process grounds, Owens-Corning must show that it had property rights affected by the CCO.
*1446 Judge King did not address the factual question whether Owens-Corning had property rights in the collateral Center used to pay off its debt to Union Bank pursuant to the CCO. In a separate adversary action, Judge Rainville did determine that Owens-Corning had a “perfected lien as to the value of any Owens-Corning Corporation inventory and proceeds thereof in possession of Center Wholesale, Inc. as of the commencement of the chapter 11 case on December, 1981, less the amount of Union’s senior security interest on December, 1981____” But Judge Rainville’s Amended Opinion and Order does not contain a valuation of Owens-Corning’s claim on the date of filing or the amount of Owens-Corning inventory used to pay off Union Bank after that date. In the July 15, 1983, hearing before Judge King, counsel for Owens-Corning indicated that valuation was an issue before Judge Rainville, but that he had not yet ruled on it.[14]
For the purposes of the following discussion, we will assume that Owens-Corning had a valid junior security interest and that Owens-Corning’s valuation of Center’s inventory is correct. This would give Owens-Corning a valid security interest in the portion of Owens-Corning inventory (allegedly worth $224,303) that exceeds the $990,000 debt Center owed Union Bank. On remand, Judge King may be able, under the doctrine of collateral estoppel, to adopt Judge Rainville’s findings, if any, as to valuation; otherwise, he should make valuation findings himself.
B. Marshaling.
Owens-Corning argued before the bankruptcy and district courts that it was entitled under California law[15] to request a marshaling of assets, requiring Union Bank to satisfy its claim out of the assets on which Owens-Corning did not have a lien before the Bank could turn to Center’s Owens-Corning inventory for satisfaction. In other words, Owens-Corning asserts that it had a valid property right in all of Center’s Owens-Corning inventory, even that part ($990,000 worth) in which Union Bank had a senior lien. We disagree.
Section 544 of the Bankruptcy Code, the “strongarm clause,” vests the trustee or debtor in possession[16] with all of
the rights and powers of ... a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained a judicial lien, whether or not such a creditor exists____
11 U.S.C. § 544(a)(1) (1982).
In its position as a judicial lien creditor under section 544, Center objected to Owens-Corning’s request for marshaling on the ground that it would do “injustice to third persons,” namely the estate. Cal.Civ. Code § 3433. If Union Bank used collateral other than Center’s Owens-Corning inventory to satisfy Union’s claim, permitting Owens-Corning exclusively to use the Owens-Corning inventory to satisfy Owens-Corning’s claim, there would be $990,000 *1447 less in assets in the estate to divide up among the unsecured creditors than if the Bank used the Owens-Corning inventory and thereby foreclosed Owens-Corning’s ability to use that portion ($990,000 worth) of the collateral to satisfy its debt.[17] Judge King agreed “with the suggestion by the debtor [in possession] that there would be prejudice to the debtor [in possession], and also to the unsecured creditors, if this marshaling approach were to be taken long after the initial order was entered.” He therefore denied Owens-Corning’s Rule 60(b) motion in part because marshaling would be inappropriate and prejudice the estate.
In In re Forester, 529 F.2d 310 (9th Cir.1976), we concluded in an alternate holding that, under the Bankruptcy Act of 1968,[18] the trustee[19] of a bankrupt estate could not block a request for marshaling made by a junior secured creditor to a senior secured creditor. Id. at 316-17.
However, after Forester was decided, the California courts clarified the rights of a judicial lien creditor in Shedoudy v. Beverly Surgical Supply Co., 100 Cal.App.3d 730, 161 Cal.Rptr. 164 (1980). In holding that a judgment creditor is entitled to a marshaling order, Shedoudy implied that such a creditor is also entitled to block a marshaling order prejudicing his interest.
Because the validity, nature, and effect of liens are governed by the law of the state where the property is located, and because California law after Shedoudy gives judicial lien creditors, such as the debtor in possession under § 544, the power to block a marshaling order, we hold as a matter of law that Center has standing to block Owens-Corning’s request for marshaling.[20] Otherwise, Owens-Corning would be able to take advantage of collateral for which it never bargained, namely, $990,000 worth of Center’s inventory other than Owens-Corning goods, to the detriment of the general unsecured creditors. Our holding, therefore, limits Owens-Corning’s property rights to the portion of Center’s Owens-Corning inventory that exceeds in value Union Bank’s senior lien, namely, $224,303 worth of Owens-Corning goods under the alleged facts.
II. Whether Owens-Corning’s Rule 60(b) (4) motion was timely.
Owens-Corning brought a motion under Fed.R.Civ.P. 60(b)(4), which provides that “[o]n motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons: ... (4) the judgment is void.” The rule requires that a 60(b)(4) motion “be *1448 made within a reasonable time,” but if a judgment is void, a motion to set it aside may be brought at any time. See 11 C. Wright & A. Miller, Federal Practice and Procedure § 2862 at 197 (1973) and cases cited therein. Moreover, a void judgment cannot acquire validity because of laches on the part of the judgment debtor (Owens-Corning in this case). Id. Therefore, Owens-Corning’s delay in bringing its Rule 60(b)(4) motion is irrelevant and the motion was timely.
III. Whether Center’s notice of the hearing to approve the CCO satisfied due process.
As noted above, Owens-Corning is appealing the bankruptcy and district courts’ denial of its Rule 60(b) motion on voidness grounds. A judgment is not void merely because it is erroneous. It is void only if the court that rendered judgment lacked jurisdiction of the subject matter, or of the parties, or if the court acted in a manner inconsistent with due process of law. See 11 C. Wright & A. Miller, Federal Practice and Procedure § 2862 at 198-200 (1973) and cases cited therein.
Owens-Corning alleges that Center provided insufficient notice of the hearing in which Judge King approved the CCO and deprived Owens-Corning of due process of law. We have previously acknowledged that a judgment may be set aside on voidness grounds under Rule 60(b)(4) for a violation of the due process clause of the Fifth Amendment. Winhoven v. United States, 201 F.2d 174, 175 (9th Cir.1952).
The Supreme Court set forth the due process requirements for notice in Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950):
An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and to afford them an opportunity to present their objections. The notice must be of such nature as reasonably to convey the required information ... and it must afford a reasonable time for those interested to make their appearance.
Id. at 314, 70 S.Ct. at 657 (citations omitted).
The Court later explained that “[t]he purpose of notice under the Due Process Clause is to apprise the affected individual of, and permit adequate preparation for, an impending ‘hearing.’ ” Memphis Light, Gas & Water Division v. Craft, 436 U.S. 1, 14, 98 S.Ct. 1554, 1563, 56 L.Ed.2d 30 (1978) (footnote omitted). Owens-Corning claims that Center’s mail-gram notice, received one day before the hearing, came too late and provided insufficient information to permit Owens-Corning adequately to prepare and present its objections. We agree.
In reaching our conclusion that the notice Center provided did not fulfill the due process requirements of timeliness and specificity, we examine the notice’s adequacy in light of the Bankruptcy Code’s statutory requirements, safeguards, and remedies. We recognize, of course, that Owens-Corning must prove a constitutional, not merely statutory, violation to succeed on its Rule 60(b)(4) motion. Yet, because the adequacy of notice depends upon the factual context in which it is given, we need to examine its timeliness and specificity in light of the Bankruptcy Code provisions governing Center’s actions under the CCO. See 11 U.S.C. §§ 102(1)(A), 363(c)(3) & 364(d)(1).
The Code contains specific provisions concerning the type of notice required when the debtor in possession wishes to use its cash collateral (§ 363(c)(2)) or to borrow additional funds after the date of filing (§ 364(d)).
Concerning the use of cash collateral, section 363(c)(2) states that “[t]he trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless — ... (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.” 11 U.S.C. § 363(c)(2) (emphasis added). Section 363(c)(3) further provides that “[a]ny hearing under paragraph (2)(B) of this subsection ... shall be scheduled in *1449 accordance with the needs of the debtor ____ The court shall act promptly on any request for authorization under paragraph (2)(B) of this subsection.” 11 U.S.C. § 363(c)(3) (emphasis added).
Concerning the obtaining of credit, section 364(d)(1) provides that “[t]he court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject, to a lien ...” 11 U.S.C. § 364(d)(1) (emphasis added).
The Code’s rules of construction define the phrase “after notice and a hearing” to mean “after such notice as is appropriate in the particular circumstances____” 11 U.S.C. § 102(1)(A) (emphasis added).
Reviewing the facts as Owens-Corning alleges them to be and as Judge Rainville’s Amended Opinion suggests they are, we conclude that Judge King’s issuance of the CCO as a final order[21] on such short notice, viz., one day, was inappropriate in the circumstances and violated the requirements of the Due Process Clause.
At the time the stipulation was approved, the bankruptcy judge and all interested parties, including Owens-Corning, had no reason to think that the CCO would affect Owens-Corning’s security interest. The CCO provided that “[t]he liens granted to [Union Bank] herein shall be senior to all other liens, security interests and encumbrances which may hereafter be created in favor of third parties,” implying that the liens would be junior to liens that Center had previously granted creditors like Owens-Corning. (Emphasis added.) Moreover, the CCO explicitly stated that “[t]he parties believe that this Stipulation does not affect the rights of any other lien-holder” and that Center “ratifies and af *1450 firms the validity, perfection and enforceability of all liens, security interests and encumbrances heretofore granted by the Debtor to [Union Bank] without prejudice to the rights of any other party.” (Emphasis added.)
The CCO did provide that Center would “turn all said collections and all cash sale proceeds over to [Union Bank], and [Union Bank] shall apply said receipts to the Loan, until payment in full of all amounts owing to [Union Bank] by [Center].” But it was not until Judge Rainville found that Owens-Corning had a perfected lien in Center’s Owens-Corning inventory and that the CCO authorized Center to erode that security interest by selling off the inventory and paying the proceeds to Union Bank, that it became clear that the CCO affected Owens-Corning’s security interest. Judge Rain-ville’s decision prompted Owens-Corning to move under Rule 60(b) for modification of the CCO to force Union Bank to marshal its assets.
The bankruptcy and district courts did not want to overturn the CCO because (1) the parties had proceeded to carry it out and make business arrangements based on their belief that the CCO was final, and (2) Owens-Corning’s request for marshaling was inappropriate since it would work to the detriment of the unsecured creditors.
Yet, to the extent the CCO permitted Center to foreclose Owens-Corning’s security interest in the portion of Center’s Owens-Corning inventory that exceeded in value Center’s original debt to Union Bank, the CCO violated section 364(d) of the Bankruptcy Code, requiring the debtor in possession to provide adequate protection of a secured creditor’s interest.
Section 364(d) permits the debtor in possession to incur debt secured by a senior lien only if the debtor demonstrates that it “is unable to obtain such credit otherwise” and that “there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.” 11 U.S.C. § 364(d)(1) (emphasis added). Adequate protection is defined in section 361 to include “providing ... an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity’s interest in such property ____” 11 U.S.C. § 361(2).
Because the CCO authorized Center to use proceeds from the inventory on which Owens-Corning was the sole lienor to pay off Center’s new debts to Union Bank, the CCO effectively granted the Bank a senior lien in that inventory. Under the provisions of section 364(d), Center was therefore required to prove that it was adequately protecting Owens-Corning’s interest. In this case, the protection probably would have consisted of granting Owens-Corning a replacement lien in other Center property. See 11 U.S.C. § 361(2).
Neither the mailgram nor the stipulation put Judge King or Owens-Corning on notice that Owens-Corning’s security interest would be affected. Particularly in light of the fact that the stipulation stated that it did “not affect the rights of any other lienholder,” Owens-Corning’s receipt the day before the hearing of notice that Center “will grant to Union Bank a lien upon all of its assets to secure all indebtedness to Union Bank” was insufficient to alert Owens-Corning that it should immediately require Center to provide it with the adequate protection to which it was entitled under the Code. We therefore find that the one-day notice violated the requirements of the Due Process Clause because the notice was insufficient to permit Owens-Corning to adequately prepare for the impending hearing in which Judge King approved the CCO. See Memphis Light, Gas & Water Division, 436 U.S. at 14, 98 S.Ct. at 1562.[22]
*1451 If the debtor in possession (Center) fails to provide adequate protection of a creditor’s security interest, section 507(b) offers an equitable solution. It directs the bankruptcy court to grant the injured creditor a “superpriority,”[23] entitling the creditor to be paid ahead of all other creditors with administrative expense claims:
(b) If the [debtor in possession], under section 362, 363, or 364 of this title, provides adequate protection of the interest of a holder of a claim secured by a lien on property of the debtor and if, notwithstanding such protection, such creditor has a claim allowable under subsection (a)(1) of this section arising from the stay of action against such property under section 362 of this title, from the use, sale, or lease of such property under section 363 of this title, or from the granting of a lien under section 364(d) of this title, then such creditor’s claim under such subsection shall have priority over every other claim allowable under such subsection.
11 U.S.C. § 507(b).
Our holding that the CCO is void to the extent it permitted Center to foreclose Owens-Corning’s security interest in the portion of Center’s Owens-Corning inventory that exceeded in value Union Bank’s senior lien does not, therefore,' require that Owens-Corning be placed in the precise position it would have occupied had Judge King never approved the CCO.[24] We suggest that the bankruptcy court consider granting Owens-Corning a superpriority under section 507(b). This would protect its interest without disturbing the myriad of transactions that have occurred in reliance on the CCO.
REVERSED and REMANDED for further proceedings in accordance with this opinion.

. The mailgram stated:
Center Wholesale Inc. commenced on 12/18/81 a proceeding under chapter 11 of the Bankruptcy Code in the U.S. Bankruptcy Court, Northern District of California. A hearing will be held in the courtroom of Bankruptcy Judge Lloyd King ... at 1:30 p.m. 12/22/81 to hear and determine the application of Center Wholesale Inc. to enter into agreement for the continued financing of its operations by its lender Union Bank. The debtor will grant to Union Bank a lien upon all of its assets to secure all indebtedness to Union Bank. You are invited but not required to attend the hearing and be heard.

. Section 364(d) provides:
(1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—
(A) the trustee is unable to obtain such credit otherwise; and
(B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.
(2) In any hearing under this subsection the trustee has the burden of proof on the issue of adequate protection.
11 U.S.C. § 364(d) (1982).

. Section 363(c) provides:
(1) If the business of the debtor is authorized to be operated under section 721, 1108, or 1304 of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.
(2) The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless—
(A) each entity that has an interest in such cash collateral consents; or
(B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.
11 U.S.C. § 363(c) (1982).

. Section 363(a) defines cash collateral as “cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents in which the estate and an entity other than the estate have an interest.” 11 U.S.C. § 363(a) (1982).

. On June 20, 1979, Union Bank filed a UCC-1 financing statement that described its collateral as follows: "[a]ll accounts, chattel paper and general intangibles, arising out of the sale of goods, or furnishing of services, and inventory, now owned or herafter acquired, all proceeds thereof and all debtor's books and records relating thereto.”

. On June 30, 1980, Owens-Corning filed a UCC-1 Financing Statement that described its collateral as "[a]ll Owens-Corning Fiberglas inventory now owned or hereafter acquired and all of the proceeds of said inventory.”

. Hereafter referred to as the Bankruptcy Code.

. At about the time we decided Burley, Congress enacted the Bankruptcy Amendments and Federal Judgeship Act of 1984, which permits appeal from the bankruptcy court to a bankruptcy appellate panel only if all the parties consent; if any party does not consent to review by the bankruptcy appellate panel, the district court must review the bankruptcy court’s orders instead. Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.Law 98-353, § 158, 98 Stat. 333, 341 (1984) (to be codified at 28 • U.S.C. § 158), reprinted in 6 1984 U.S.Code Cong. & Ad.News, 98 Stat. 341.

. Congress had not yet enacted remedial legislation, supra note 8, when the Marathon stay expired on December 24, 1982. Faced with the unconstitutionality of the existing bankruptcy courts, the United States District Court for the Northern District of California enacted General Order 24, the name given to the Model Rule for the Continued Operation of the Bankruptcy Court System. Under General Order 24, the district court referred “[a]ll cases under Title 11

. See note 10 on page 1445. *1445 and all civil proceedings arising under Title 11 or arising in or related to cases under Title 11” to the bankruptcy judges of the district. General Order 24, section (c)(1).

. General Order 24 permitted bankruptcy judges to enter final orders and judgments in all matters except "related proceedings.” Section (d) (2). "Related proceedings are those civil proceedings that, in the absence of a petition in bankruptcy, could have been brought in a district court or a state court” but "do not include ... orders authorizing use of cash collateral ....” Section (d)(3)(A). In related proceedings, the bankruptcy judges were not authorized to enter a judgment or dispositive order, but were required to submit findings, conclusions, and a proposed judgment to the district court. Section (d)(3)(B). After review, the district court would enter what it regarded to be the appropriate judgment or order. Section (e) (2)(B).
Although Owens-Corning’s Rule 60(b)(4) motion raises constitutional issues of due process, the motion is not a “related proceeding” because it could not have been brought in the district court in the absence of the bankruptcy case. The underlying order authorizing the use of cash collateral could have been entered only in the context of a bankruptcy proceeding and the due process issues arise only in relation to this order. Therefore, Judge King properly entered a final order and United States District Judge Patel properly acted as an appellate court in reviewing the order.

. In cases involving "related proceedings,” the district court does not act as an appellate court because the bankruptcy court merely submits a proposed order to the district court. See supra note 11. General Order 24, section (d)(3)(B). Therefore, our standards for reviewing BAP opinions would not apply to our review of a district court’s decision in a related proceeding. We express no opinion as to the appropriate standard of review for district court decisions involving related proceedings.

. See IB J. Moore, J. Lucas & T. Currier, Moore's Federal Practice jfjf 0.441-0.448 (2d ed. 1984).

. Denial of Owens-Corning’s request for marshaling was based in part on Judge King's belief that Judge Rainville was conducting a valuation of Owens-Corning’s security interest: "I think that tracing if possible is the appropriate way to determine the extent of the security interest of Owens-Corning Fiberglas and that that will be done in the adversary proceeding before Judge Rainville.”

. Cal.Civ.Code § 3433 (West 1970) provides:
Where a creditor is entitled to resort to each of several funds for the satisfaction of his claim, and another person has an interest in, or is entitled as a creditor to resort to some, but not all of them, the latter may require the former to seek satisfaction from those funds to which the latter has no such claim, so far as it can be done without impairing the right of the former to complete satisfaction, and without doing injustice to third persons.
See also Cal.Civ.Code § 2899 (West 1974).

. Section 1107 of the Bankruptcy Code vests a debtor in possession with all of the rights, powers, functions and duties of a trustee. 11 U.S.C. § 1107(a) (1982). Because Center, as debtor in possession, takes the place of a trustee in the case, we will discuss the Code’s provisions in terms of a debtor in possession instead of a trustee.

. If Owens-Corning forces Union Bank to marshal its collateral, Union Bank would satisfy its claim for $990,000 out of Center’s inventory (worth $5,098,975) other than Owens-Corning goods, allowing Owens-Corning to apply the full value of the Owens-Corning inventory ($1,214,-303) against its $1,400,000 claim. This would leave at most $4,108,975 worth of inventory in the estate for general unsecured creditors.
If Owens-Corning cannot force Union Bank to marshal its collateral, then Union can satisfy its entire $990,000 claim out of the Owens-Corning inventory, leaving Owens-Corning $224,303 worth of the inventory to apply against Owens-Corning's claim. This would leave $5,098,975 worth of inventory in the estate for general unsecured creditors.

. Hereafter referred to as the Bankruptcy Act.

. Section 70 of the Bankruptcy Act, like section 544 of the Bankruptcy Code, gave the trustee the rights and powers of a judgment lien creditor. 11 U.S.C. § 110 (superceded in 1978).

. See Duck v. Wells Fargo Bank (In re Spectra Prism Industries, Inc.), 28 B.R. 397, 399 (Bankr. 9th Cir.1983) (Shedoudy mandated holding that "a trustee in bankruptcy, as a judicial lien creditor pursuant to Bankruptcy Code § 544(a)(1), has standing to block the issuance of an order requiring a senior lienholder to marshal its collateral”); cf. In re Jack Green’s Fashions for Men — Big and Tall, Inc., 597 F.2d 130, 133 (8th Cir.1979) (trustee can compel marshaling so as to preserve the lien interest of the bankruptcy estate in certain property); In re Clary House, Inc., 11 B.R. 462, 466-67 (Bankr.W.D.Mo.1981) (same). Contra In re The Computer Room, Inc., 24 B.R. 732, 734 (Bankr.N.D.Ala.1982) (junior creditor in bankruptcy can order senior to marshal its collateral); cf. In re McElwaney, 40 B.R. 66, 70-72 (Bankr.M.D.Ga.1984) (trustee cannot compel marshaling because section 544 "was not intended to benefit the Trustee over a perfected junior secured creditor”); In re Larry’s Equipment Service, Inc., 23 B.R. 132 (Bankr.D. Me. 1982) (same).

. We realize that "in certain circumstances the entire reorganization effort may be thwarted if emergency relief is withheld" and that reorganization under the Bankruptcy Code "is a perilous process, seldom more so than at the outset of the proceedings when the debtor is often without sufficient cash flow to fund essential business operations." In re Sullivan Ford Sales, 2 B.R. 350, 355 (Bankr.D.Me.1980). It is for this very reason that Congress specified that hearings concerning the use of cash collateral “shall be scheduled in accordance with the needs of the debtor.” 11 U.S.C. § 363(c)(3) (1982). However, the necessity of an immediate hearing to authorize the debtor's use of cash collateral or borrowing does not excuse a careful consideration of the continued propriety of such actions at a later date. In the legislative history accompanying section 102(1), which defines notice and hearing as that which “is appropriate in the particular circumstances,” Congress acknowledged that "[i]n very limited emergency circumstances, there will be insufficient time for a hearing to be commenced before an action must be taken. The action sought to be taken may be taken if authorized by the court at an ex parte hearing of which a record is made in open court. A full hearing after the fact will be available in such an instance." 124 Cong.Rec. 33,993 (1978). See 2 Collier on Bankruptcy f 102.02 at 102-6 (15th ed. 1984).
After examining the statutory provisions and the legislative history behind the requirement of notice and a hearing, the bankruptcy court in In re Sullivan Ford Sales, analogized an order authorizing the debtor’s borrowing under section 364(c)(1) to a temporary restraining order. The court concluded that such an order “should remain in effect not more than ten days from its issuance, unless extended by the court within the ten-day period for good cause shown or by agreement of all adverse parties.” 2 B.R. at 357. The court in In re Sheehan followed a similar procedure. Although it authorized the debtor’s use of cash collateral at a hearing of which the debtor's major creditors has only 72 hours advance notice, the court scheduled a final hearing approximately 12 days later. In re Sheehan, 38 B.R. 859, 863 (Bankr.D.S.D.1984).
The debtor in the instant case appears to have proceeded under the assumption that Judge King’s approval of the CCO on December 22 was merely temporary because its notice described the January 14 hearing as one to consider the “continued effectiveness” of the CCO. Judge King subsequently determined that the CCO was final because it did not contain a provision conditioning its effectiveness on the court’s approval at the January 14 hearing.
Had the CCO contained such a provision and had Judge King seriously reconsidered the CCO’s propriety at the January 14 hearing or granted Owens-Corning’s request for a continuance and reconsidered the CCO at a later hearing where Owens-Corning, the creditors’ committee, and the other creditors had a chance to challenge fully the CCO, then the notice of the December 22 hearing probably would have been sufficient to satisfy due process. Notice of a hearing for a temporary order need not meet the stringent standards notice of a hearing for a final order must meet to pass constitutional muster.

. Both Owens-Corning and Center cite to bankruptcy court decisions finding the notice given by the debtor in possession either appropriate or inappropriate under the circumstances of the particular case. Because these decisions are fact specific and do not directly address the due process issue, they are not particularly helpful in resolving questions of notice in the instant case. See e.g., In re Sheehan, 38 B.R. 859 (Bankr.D.S.D.1984); In re Adamson Co., Inc., 29 B.R. 937 (Bankr.E.D.Va.1983); In re Anderson-Walker Industries, Inc., 3 B.R. 551 (Bankr.C.D. *1451 Cal.1980); In re Sullivan Ford Sales, 2 B.R. 350 (Bankr.D.Me.1980).
In the only case involving the issue of adequate protection, Anderson-Walker Industries, the creditor who was objecting to the use of cash collateral was vastly oversecured: its collateral was worth 7.3 times its secured claim. Id. at 552. There was little risk that Anderson-Walker’s use of the cash collateral would harm the creditor’s interest. In contrast, Owens-Corning is vastly undersecured: its claim is worth nearly 7 times its collateral. Therefore, both the risk of harm and the importance of notice are greatly increased.

. Section 507(b) addresses the situation where the debtor in possession initially provides protection that, after the fact, turns out to be inadequate. In Owens-Corning’s case, Center never provided protection in the first place. Therefore, although not literally within the provisions of section 507, Owens-Corning’s injury is clearly within its spirit and deserves to be remedied by granting its claim a superpriority. Cf. In re Prime, 35 B.R. 697 (Bankr.W.D.Mo.1984) (secured creditor is entitled to a superpriority under section 507(b) even though debtor had previously entered into a settlement with the creditor instead of proving to the court that debtor could adequately protect the creditor’s interest).

. Even had we desired to put Owens-Corning back into the position it occupied before Judge King approved the CCO, section 364(e) of the Bankruptcy Code would prevent us from doing so. It specifically provides that
[t]he reversal or modification on appeal of an authorization under this section to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal____
11 U.S.C. § 364(e) (1982).

. Although Judge King issued the CCO on December 22, 1981, Owens-Corning is appealing his denial of Owens-Corning’s Rule 60(b) motion on July 15, 1983. Therefore, Owens-Corning correctly appealed to the district court.